**In re The LANTANA MOTEL, A Limited Partnership, Debtor.**

**Bankruptcy Nos. 2–90–05478, 31–1211188.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Nov. 13, 1990.

Kenneth Cookson, Carlile, Patchen, Murphy & Allison, Columbus, Ohio, for debtor.

Daniel R. Swetnam, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for Resolution Trust Corp.

Jay Alix, Jay Alix & Associates, Southfield, Mich., Chapter 11 Trustee, Michael L. Cook, Sally M. Henry, Skadden, Arps, Slate, Meagher & Flom, New York City, Gen. Counsel to the Trustee, Marilyn Shea–Stonum, Carol Stebbins, Jones, Day, Reavis

& Pogue, Columbus, Ohio, Special Counsel to the Trustee, for Cardinal Industries, Inc. and Cardinal Lodging Group, Inc.

Charles M. Caldwell, Asst. U.S. Trustee, Columbus, Ohio, Columbus Office of the United States Trustee for Region IX.

Lori Lapin Jones, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, and Leon Friedberg, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, P. Steven Kratsch, Kilpatrick & Cody, Atlanta, Ga., for the Official Committee of Unsecured Creditors of Cardinal Industries of Florida, Inc.

Harvey S. Minton, Minton & Leslie, Columbus, Ohio, for Cardinal Industries of Georgia, Inc., Cardinal Industries Mortg. Co. and Cardinal Parts Service Co.

James H. Bownas, Cardinal Industries, Inc., Columbus, Ohio, Charles J. Taunt, Birmingham, Mich. for Cardinal Industries Services Corp., Cardinal Industries of Florida Services Corp., Cardinal Industries of Georgia Services Corp. and Cardinal Furniture Leasing Co.

Thomas R. Noland, Altick & Corwin, Dayton, Ohio, for Cardinal Partnership Corp. and Cardinal Partner Corp.

Gary H. Cunningham, Kramer Mellen, P.C., Southfield, Mich., for Cardinal Lodging Group, Inc. and Cardinal Apartment Management Group, Inc.

Sara J. Daneman, Chester, Hoffman, Willcox & Saxbe, Columbus, Ohio, for Cardinal Industries Development Corp.

OPINION AND ORDER ON OBJECTION OF RESOLUTION TRUST CORPORATION AS CONSERVATOR OF COMMONWEALTH FEDERAL SAVINGS AND LOAN TO DEBTOR'S USE OF CASH OR RENTS GENERATED BY THE PROPERTY OWNED BY THE DEBTOR

BARBARA J. SELLERS, Bankruptcy Judge.

I. PRELIMINARY CONSIDERATIONS AND JURISDICTIONAL STATEMENT

This matter is before the Court upon an objection (the "Objection") by Resolution

Trust Corporation as Conservator of Commonwealth Federal Savings and Loan ("RTC") to the use by Chapter 11 debtor, The Lantana Motel, a Limited Partnership ("Lantana" or "Debtor") of cash or rents generated by its property. Lantana opposes the Objection and seeks, by separate motion, authority to use cash collateral. Cardinal Lodging Group, Inc. ("CLG"), itself a Chapter 11 debtor, has also responded to the Objection.

RTC and Lantana have reached an agreement on all material issues raised by these cash collateral pleadings except for an issue concerning the payment of franchise, management, bookkeeping and performance fees to CLG. The parties disagree as to whether the payment of these fees should be subordinate to the Debtor's obligations to RTC.

The matter was originally heard on October 11, 1990, at which time CLG did not appear. On October 16, 1990, a supplemental hearing was held to permit CLG to be heard on the matter. Following that hearing, the Court took the matter under advisement.

The Court has jurisdiction in this matter under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O) which this bankruptcy judge may hear and determine. For the reasons stated herein, the Court holds that CLG's right to the payment of fees is not subordinate to Lantana's obligations to RTC.

## II. FACTS AND ARGUMENTS

The Debtor is a Florida limited partnership which owns as its primary asset a motel known as the Lantana Knights Inn located in Lantana, Florida (the "Property"). In December 1987, the Debtor executed various documents designed to memorialize and secure a $3,920,000 loan to it from Commonwealth Federal Savings and Loan ("Commonwealth"). These documents included a promissory note (the "Note") and a Mortgage and Security Agreement (the "Mortgage") in favor of Commonwealth.

Previously, on November 1, 1987, Lantana had entered into a franchise agreement (the "Franchise Agreement") with Cardinal Industries, Inc. ("CII") relating to the Property. On December 21, 1987, Lantana and CII executed a Subordination and Attornment Agreement (the "Franchise Subordination Agreement") whereby Lantana and CII agreed to subordinate the Franchise Agreement to the Mortgage. On December 17, 1987, Lantana and CLG, then a division of CII, had executed a similar Subordination and Attornment Agreement (the "Management Subordination Agreement") whereby Lantana and CLG agreed to subordinate to the Mortgage a motel management agreement (the "Management Agreement") dated November 1, 1987 between Lantana and CLG. (The Franchise Subordination Agreement and the Management Subordination Agreement together will be referred to as the "Subordination Agreements.") Copies of the Subordination Agreements, without exhibits, are attached hereto.

On January 12, 1988, Lantana and Commonwealth executed a certain Modification of Promissory Note and Mortgage and Security Agreement to correct a scrivener's error concerning the commencement date for the payment of principal and interest under the Note. All references to the Note and/or Mortgage, therefore, mean the Note and/or Mortgage as modified.

In February 1989, Lantana defaulted on its obligations under the Note. Thereafter, in May 1990, RTC, as conservator for Commonwealth, instituted a foreclosure action in Florida state court in which RTC also requested appointment of a receiver. On August 10, 1990, the Florida state court entered a judgment of foreclosure and set a foreclosure sale for September 24, 1990. That sale was stayed by the Debtor's filing of its Chapter 11 petition.

All parties apparently agree that CLG is the successor-in-interest to CII under the Franchise Agreement and the Franchise Subordination Agreement. RTC is also the successor to Commonwealth for all purposes.

RTC contends that the Subordination Agreements entitle it to payment in full before CLG may receive any payments under the Franchise Agreement or the Management Agreement. RTC urges that such a broad construction of the concededly vague language of the Subordination Agreements best implements what must have been the intention of the parties at the time of the loan.

CLG, on the other hand, maintains that RTC misinterprets the intent and scope of the Subordination Agreements and that the Subordination Agreements do not subordinate CLG's right to receive payments under the Franchise Agreement and the Management Agreement. Instead, argues CLG, the Subordination Agreements serve merely to insure the superiority of the Mortgage and to resolve any incongruities between the provisions of the Mortgage and the provisions of the Franchise Agreement and the Management Agreement. Lantana joins in this position.

## III. ISSUE PRESENTED

The issue before the Court is whether the Subordination Agreements subordinate CLG's right to payment under the Franchise Agreement and the Management Agreement to the Debtor's obligations to RTC.

## IV. LEGAL DISCUSSION

Poorly drafted documents often make for spirited litigation. Here, the Court is asked to construe the intent and scope of Subordination Agreements which are so unskillfully crafted that meaningful interpretation approaches the impossible.

Aside from the general lack of clarity, a glaring inconsistency in the Subordination Agreements prompted some initial discussion among the parties as to their enforceability by RTC. Particularly, Commonwealth is a named party to the Subordination Agreements and in the fourth paragraph of each such agreement "covenant[s] and agree[s]" to the substantive provisions of the document. However, there are no signature lines for Commonwealth and Commonwealth did not execute the Subordination Agreements. Upon consideration, the Court finds that the Subordination Agreements are valid and enforceable without Commonwealth's signature and RTC may enforce them. *See, e.g., Johnson v. Florida Bank at Orlando,* 153 Fla. 120, 13 So.2d 799 (1943) (subordination agreement enforced although mortgagee not a party thereto). Since the Subordination Agreements are enforceable under nonbankruptcy law, they are enforceable in this Chapter 11 case. 11 U.S.C. § 510(a).

More pressing and difficult is the parties' disagreement as to the meaning of the Subordination Agreements. The Court is called upon to divine the intent of documents that are, as counsel for RTC puts it, "what we've got and we have to work with." Record at 31 (October 11, 1990 hearing). Before the Court proceeds to its task, however, a general discussion of subordination agreements is appropriate.

### A. *Subordination Agreements Generally*

"A subordination agreement is an agreement by which a party having a superior right of some sort agrees with someone having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior." Feinstein and Kayles, *Foreclosure: Subordination, Non–Disturbance and Attornment Agreements,* Prob. and Prop., July/August 1989, at 38. In the context of commercial financing, subordination agreements may be generally classified as being one of two types: debt subordinations or property interest subordinations.[1]

In a debt subordination, the agreement provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant. If the debt subordination is "complete," the subordinated creditor is barred

---

1. For a general discussion of subordination agreements in the context of commercial financing, *see,* Nimmer, *Commercial Asset–Based Financing* § 8.38 (1990); Rude, *Asset Based Financing: A Transactional Guide* § 13.01 *et seq.* (1990).

from receiving payments until the superior debt is paid in full.

Debt subordinations are routinely utilized when a corporate or partnership borrower seeks financing from a commercial lender. The commercial lender will insist that all indebtedness of the corporation or partnership to management or other insiders be subordinated to the lender's proposed financing. The lender demands subordination for reasons more than just security; the lender wants its loans to be used as working capital in the borrower's business and not just to repay insider debts.

■ Debt subordination should be contrasted to property interest subordination. In a property interest subordination, the agreement affects only the relative rights of parties in particular real or personal property. Property interest subordination does not concern any rights the parties may have to receive payments.

■ The most common type of property interest subordination is lien subordination. By executing a lien subordination agreement, the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse to the identified collateral until the other party's secured claim has been satisfied. *See*, U.C.C. § 9–316. In a pure lien subordination, the subordinating party's right to receive payments is not limited.

■ Another common type of property interest subordination is mortgagee-tenant subordination. With this type of subordination, the mortgage lender insists that, as a condition to its lending money to the landlord, the tenant subordinate its lease to the lender's mortgage. In modern commercial mortgage lending, both lien subordination and mortgagee-tenant subordination are frequently seen as a part of the mortgage lender's effort to give its mortgage priority over all other property interests.

## B. *The Subordination Agreements In This Case*

■ The parties' interpretations of the Subordination Agreements can best be examined in the context of the debt subordination/property interest subordination dichotomy. RTC unquestionably views the Subordination Agreements as documents of debt subordination. CLG and Lantana, to the contrary, see the Subordination Agreements as being more in the nature of property interest subordinations.

For several reasons, the Court believes that the intent and scope of the Subordination Agreements are as CLG and Lantana suggest. First, the language of the Subordination Agreements, when considered in its totality, does not indicate that CLG intended a debt subordination. While the words "and the debt secured thereby" contained in the first numbered paragraph of each of the Subordination Agreements might be construed to effect a debt subordination, the remaining provisions of the documents, especially those found in numbered paragraphs two through four, indicate that the Subordination Agreements were intended only to grant to Commonwealth, now RTC, certain rights, including superior rights in the Property, in the event of foreclosure. The admittedly vague language of the Subordination Agreements is no more than a variation of the lien subordination and mortgagee-tenant subordination agreements discussed above; it serves to resolve in the nervous lender's mind that, in the event of foreclosure, the mortgage will have priority over all other property interests. The Court is cognizant that any property interests which were arguably transferred by Lantana pursuant to the Franchise Agreement and the Management Agreement are tenuous at best and can affect only the relationship between the signatories and Commonwealth, since the Franchise Agreement and the Management Agreement are not documents that normally would be recordable in state real property records. Nevertheless, the Court views the Subordination Agreements as purely precautionary documents that were included in Commonwealth's loan package. The Subordination

Agreements, in their entirety, do not evidence an intention of debt subordination.

Second, the holding that the Subordination Agreements provide for only property interest subordination is more consistent with CLG's history of receiving payments from Lantana. As indicated above, property interest subordinations do not affect the subordinated party's right to receive payments. Debt subordinations, on the other hand, typically postpone the subordinated party's right to payments until the senior creditor is fully paid, unless payments are permitted under the provisions of the agreement. There are no provisions in the Subordination Agreements for permitted payments to CLG, yet such payments have been made. Interpreting the Subordination Agreements as only property interest subordinations best comports with this fact.

Finally, the Subordination Agreements were executed in a context atypical of debt subordinations. As previously discussed, lenders, when making commercial loans to corporate or partnership borrowers, often require the subordination of all obligations the borrower may have to insiders, such as officers, directors, stockholders, partners or venturers. Commercial lenders require such debt subordination to prevent their commercial loans from being used to repay insider debt. Here, although CLG is now an affiliate of the Debtor's general partner, the payments due CLG under the Franchise Agreement and the Management Agreement can hardly be considered as being of the nature of dividends, draws, distributions, bonuses or loans payable—those sort of insider payments typically subordinated to the lender's rights. Instead, the Debtor's obligations to CLG under the Franchise Agreement and the Management Agreement are more in the nature of payables incurred in Lantana's ordinary course of business for services performed immediately prior to the payment.

## V. CONCLUSION

In sum, the language of the Subordination Agreements as well as the nature of the loan and subordination support only one construction of the documents: payments due CLG under the Franchise Agreement and the Management Agreement are not subordinated to payment in full by the Debtor of its obligations to RTC.

Based upon the foregoing, the Court finds that the Subordination Agreements do not subordinate CLG's right to payment under the Franchise Agreement and the Management Agreement to Lantana's obligations to RTC. The Debtor and RTC represented to the Court at the hearing that a stipulated cash collateral agreement would soon be submitted. That agreement should reflect this holding.

IT IS SO ORDERED.

## APPENDIX
### SUBORDINATION AND ATTORNMENT AGREEMENT

THIS SUBORDINATION AND ATTORNMENT AGREEMENT, made this 2nd day of December, 1987, between COMMONWEALTH SAVINGS & LOAN ASSOCIATION OF FLORIDA, a Florida chartered stock savings association (hereinafter called "Lender"), and CARDINAL INDUSTRIES, INC., an Ohio corporation (hereinafter called "Franchisor");

### W I T N E S S E T H :

WHEREAS, Lender is making a loan to THE LANTANA MOTEL, LTD., a Florida limited partnership (hereinafter called "Franchisee") secured by a mortgage and security agreement (hereinafter called the "Mortgage"), covering the real estate described in attached Exhibit "A" (hereinafter called the "Premises"), which Mortgage is to be recorded in Official Records of Palm Beach County, Florida; and

WHEREAS, Franchisee has entered into a Franchise Agreement relating to a Knights Inn Motel (hereinafter called the "Franchise Agreement") with Franchisor dated November 1, 1987, relating to the Premises, a true and correct copy of which is attached hereto as Exhibit "B".

NOW, THEREFORE, in consideration of the premises and the sum of Ten Dollars ($10.00) in hand paid by Lender to Franchisor, the receipt whereof is hereby acknowledged, Lender and Franchisor do hereby mutually covenant and agree as follows:

1.    The Franchise Agreement now is, and shall at all times continue to be, subject and subordinate in each and every respect to the Mortgage, and the debt secured thereby, and to any and all increases, future advances, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Mortgage and to any future mortgage or mortgages affecting the Premises in favor of the holder of the Mortgage.

2.    If the Lender, or any third person acquiring title from the Lender, should acquire the Premises in any foreclosure or any action or proceeding instituted under or in connection with the Mortgage or in case the Lender takes possession of the Premises pursuant to any provisions of the Mortgage, unless Franchisee would have had such right if the Mortgage had not been made, the person (including, but not limited to, the Lender) acquiring the interests of Franchisee as a result of such action or proceeding, his successors or assigns (herein called the "Purchaser"), regardless of whether the Franchise Agreement is terminated, shall not be:  (a) liable for any act or omission of any prior franchisee (including Franchisee); or (b) subject to any offsets or defenses which Franchisor might have against any prior franchisee (including Franchisee); or (c) bound to make any fees or payments which Franchisor might be owed for more than the current month; or (d) bound by any amendment or modification (including by waiver) of the Franchise Agreement made without Lender's prior written consent.

3.    If the interests of Franchisee under the Franchise Agreement shall be transferred by reason of foreclosure or other proceedings for enforcement of the Mortgage or by sale or transfer in lieu of foreclosure, and if the Purchaser elects to continue the Franchise Agreement, Franchisor shall be bound to the Purchaser under all of the terms, covenants and conditions of the Franchise Agreement, for the balance of the term thereof remaining and any extensions or renewals thereof which may be effected in accordance with any option therefor in the Franchise Agreement, with the same force and effect as if the Purchaser were the franchisee under the Franchise Agreement, and Franchisor does hereby attorn to the Purchaser, as its franchisee, said attornment to be effective and self-operative without the execution of any further instruments upon Lender succeeding to the interest of Franchisee under the Franchise Agreement.  The respective rights and obligations of Franchisor and the Purchaser upon such attornment, to the extent of the then remaining balance of the term of the Franchise Agreement and any extensions and renewals, shall be and are the same as now set forth therein except as herein otherwise expressly provided.  Nothing contained herein shall constitute an election of or obligation on Purchaser to continue the Franchise Agreement and, notwithstanding anything in this Agreement or in the Franchise Agreement to the contrary, Purchaser shall have the right to terminate the Franchise Agreement for any reason whatsoever.

4.    In the event of any act or omission of Franchisee which would give Franchisor the right, immediately or after the lapse of time, to cancel or terminate the Franchise Agreement, or to take any offset against any payments due under the Franchise Agreement, Franchisor shall not exercise such right (i) until it has given written notice of such act or omission to Lender, and (ii) until affording the Lender a reasonable opportunity after the receipt of such notice to perform or remedy on behalf of Franchisee such act or omission (there being no duty or obligation on Lender to perform or remedy), but in no event more than thirty (30) days after the expiration of any  period to cure the default which is afforded to Franchisee by the Franchise Agreement, unless such obligations cannot be performed by Lender within said thirty (30) days in which case there must be some diligent commencement to cure within said thirty (30) days and

prosecution of such cure to completion thereafter. Written notice shall be deemed to be given when mailed, certified mail, return receipt requested, postage prepaid, to:

> Commonwealth Savings & Loan Association
> of Florida
> 2000 West Commercial Boulevard
> Fort Lauderdale, Florida 33309
> Attn: Commercial Loan Department

5. Franchisor agrees that all office records, books and accounts maintained by Franchisor pursuant to the Franchise Agreement, together with any and all contracts relating to the management or maintenance of the Premises, shall be subject to examination by Lender's authorized agents at all reasonable hours. Franchisor agrees to turn over to Purchaser, upon written request therefor, all such office records, books and accounts and contracts and to otherwise cooperate with Purchaser and its agents in effectuating any change in management of the Premises.

6. The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto. However, Franchisor agrees to execute and deliver to Lender, or any person to whom Franchisor herein agrees to attorn, such other instrument as either shall reasonably request in order to effectuate such provisions. To the extent the foregoing provisions conflict with the Franchise Agreement, the provisions herein shall govern and this Agreement shall be deemed to be an amendment to the Franchise Agreement.

7. This Agreement shall inure to the benefit of and shall be binding upon the parties hereto, their successors and assigns, and it is expressly understood that all references herein to "Lender" shall be deemed to include any subsequent holder of the Mortgage and/or any other persons succeeding to title to the Premises, or any part thereof, whether by virtue of foreclosure (or sale or transfer in lieu of foreclosure) or pursuant to the exercise of any rights and remedies under the Mortgage, or otherwise.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed the day and year first above written.
Signed, sealed, and
delivered in our presence:

FRANCHISOR:

CARDINAL INDUSTRIES, INC., an
Ohio corporation

By: _____
W. S. Coffin, Vice President

Accepted and Authorized by:

FRANCHISEE:

THE LANTANA MOTEL, LTD.,
a Florida limited partnership
by its sole general partner

By: Cardinal Industries, Inc.,
an Ohio Corporation as
general

By: _____
W. S. Coffin, Vice President

STATE OF FLORIDA )
) ss:
COUNTY OF SEMINOLE )

260

The foregoing instrument was acknowledged before me this _21st_ day of December, 1987 by W. S. Coffin as Vice President of Cardinal Industries, Inc., an Ohio corporation, on behalf of said corporation.

_____
Notary Public
State of Florida

My Commission Expires:

Notary Public, State of Florida at Large
My commission expires December 12, 1988
Bonded thru LAWYER'S SURETY CORP.

STATE OF FLORIDA     )
                     )  ss:
COUNTY OF SEMINOLE   )

The foregoing instrument was acknowledged before me this _21st_ day of December, 1987 by W. S. Coffin as Vice President of Cardinal Industries, Inc., a Florida corporation, the sole general partner of The Lantana Motel, Ltd., a Florida limited partnership, on behalf of said corporation and limited partnership.

_____
Notary Public
State of Florida

My Commission Expires:

Notary Public, State of Florida at Large
My commission expires December 12, 1988
Bonded thru LAWYER'S SURETY CORP.

## SUBORDINATION AND ATTORNMENT AGREEMENT

THIS SUBORDINATION AND ATTORNMENT AGREEMENT, made this _17_ day of December, 1987, between COMMONWEALTH SAVINGS & LOAN ASSOCIATION OF FLORIDA, a Florida chartered stock savings association (hereinafter called "Lender"), and CARDINAL LODGING GROUP, a division of Cardinal Industries, Inc., an Ohio corporation (hereinafter called "Agent");

## W I T N E S S E T H :

WHEREAS, Lender is making a loan to THE LANTANA MOTEL, INC., a Florida limited partnership, whose sole general partner is Cardinal Industries, Inc., an Ohio corporation ("Landlord") secured by a mortgage and security agreement (hereinafter called the "Mortgage"), covering the real estate described in attached Exhibit "A" (hereinafter called the "Premises"), which Mortgage is to be recorded in the Public Records of Palm Beach County, Florida; and

WHEREAS, Landlord has entered into a Motel Management Agreement (hereinafter called the "Management Agreement") with Agent dated November 1, 1987, relating to the Premises (hereinafter called the "Premises"), a true and correct copy of which is attached hereto as Exhibit "B".

NOW, THEREFORE, in consideration of the premises and the sum of Ten Dollars ($10.00) in hand paid by Lender to Agent, the receipt whereof is hereby acknowledged, Lender and Agent do hereby mutually covenant and agree as follows:

1.    The Management Agreement now is, and shall at all times continue to be, subject and subordinate in each and every respect to the Mortgage, and the debt secured thereby, and to any and all increases, future advances, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Mortgage and to any future mortgage or mortgages affecting the Premises in favor of the holder of the Mortgage.

2.    If the Lender, or any third person acquiring title from the Lender, should acquire the Premises in any foreclosure or any action or proceeding instituted under or in connection with the Mortgage or in case the Lender takes possession of the Premises pursuant to any provisions of the Mortgage, unless Landlord would have had such right if the Mortgage had not been made, the person (including, but not limited to, the Lender) acquiring the interests of Landlord as a result of such action or proceeding, his successors or assigns (herein called the "Purchaser"), regardless of whether the Management Agreement is terminated, shall not be:   (a) liable for any act or omission of any prior landlord (including Landlord); or (b) subject to any offsets or defenses which Agent might have against any prior landlord (including Landlord); or (c) bound to make any fees or payments which Agent might be owed for more than the current month; or (d) bound by any amendment or modification (including by waiver) of the Management Agreement made without Lender's prior written consent.

3.    If the interests of Landlord under the Management Agreement shall be transferred by reason of foreclosure or other proceedings for enforcement of the Mortgage or by sale or transfer in lieu of foreclosure, and if the Purchaser elects to continue the Management Agreement, Agent shall be bound to the Purchaser under all of the terms, covenants and conditions of the Management Agreement, for the balance of the term thereof remaining and any extensions or renewals thereof which may be effected in accordance with any option therefor in the Management Agreement, with the same force and effect as if the Purchaser were the landlord under the Management Agreement, and Agent does hereby attorn to the Purchaser, as its landlord, said attornment to be effective and self-operative without the execution of any further instruments upon Lender succeeding to the interest of Landlord under the Management Agreement.  The respective rights and obligations of Agent and the Purchaser upon such attornment, to the extent of the then remaining balance of the term of the Management Agreement and any extensions and renewals, shall be and are the same as now set forth therein except as herein otherwise expressly provided.  Nothing contained herein shall constitute an election of or obligation on Purchaser to continue the Management Agreement and, notwithstanding anything in this Agreement or in the Management Agreement to the contrary, Purchaser shall have the right to terminate the Management Agreement for any reason whatsoever.

4.    In the event of any act or omission of Landlord which would give Agent the right, immediately or after the lapse of time, to cancel or terminate the Management Agreement, or to take any offset against any payments due under the Management Agreement, Agent shall not exercise such right (i) until it has given written notice of such act or omission to Lender, and (ii) until affording the Lender a reasonable opportunity after the receipt of such notice to perform or remedy on behalf of Landlord such act or omission (there being no duty or obligation on Lender to perform or remedy), but in no event more than thirty (30) days after the expiration of any  period to cure the default which is afforded to Landlord by the Management Agreement, unless such obligations cannot be performed by Lender within said thirty (30) days in which case there must be some diligent commencement to cure within said thirty (30) days and prosecution of such cure to completion thereafter.  Written notice shall be deemed to be given when mailed, certified mail, return receipt requested, postage prepaid, to:

262

Commonwealth Savings & Loan Association
of Florida
2000 West Commercial Boulevard
Fort Lauderdale, Florida 33309
Attn: Commercial Loan Department

5.    Agent agrees that all office records, books and accounts maintained by Agent pursuant to the Management Agreement, together with any and all contracts relating to the management or maintenance of the Premises, shall be subject to examination by Lender's authorized agents at all reasonable hours. Agent agrees to turn over to Purchaser, upon written request therefor, all such office records, books and accounts and contracts and to otherwise cooperate with Purchaser and its agents in effectuating any change in management of the Premises.

6.    The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto. However, Agent agrees to execute and deliver to Lender, or any person to whom Agent herein agrees to attorn, such other instrument as either shall reasonably request in order to effectuate such provisions. To the extent the foregoing provisions conflict with the Management Agreement, the provisions herein shall govern and this Agreement shall be deemed to be an amendment to the Management Agreement.

7.    This Agreement shall inure to the benefit of and shall be binding upon the parties hereto, their successors and assigns, and it is expressly understood that all references herein to "Lender" shall be deemed to include any subsequent holder of the Mortgage and/or any other persons succeeding to title to the Premises, or any part thereof, whether by virtue of foreclosure (or sale or transfer in lieu of foreclosure) or pursuant to the exercise of any rights and remedies under the Mortgage, or otherwise.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed the day and year first above written.

Signed, sealed, and
delivered in our presence:

                                    AGENT:

                                    CARDINAL LODGING GROUP, a
                                    division of Cardinal Industries,
                                    an Ohio corporation

_Christine A Kent_                  By: _Theodore M. Wolf_

_____                     Title: _Vice President & Controller_

Accepted and Authorized by:

LANDLORD:

THE LANTANA MOTEL, LTD.,
a Florida limited partnership,
by its sole general partner

By:  CARDINAL INDUSTRIES, INC.,
     an Ohio corporation

     By: _____
         W. S. Coffin, Vice President

STATE OF  Ohio )
              ) ss:
COUNTY OF Franklin

The foregoing instrument was acknowledged before me this 17TH day of December, 1987 by *Theodore M Wolf* as *Vice President and Controller* of CARDINAL LODGING GROUP, a Division of Cardinal Industries, an Ohio corporation, on behalf of the corporation.

MONICA J. HYLBERT
Notary Public, State of Ohio
Commission Expires 5-9-89

*Monica J. Hylbert*
Notary Public
State of Ohio