**In re CHICAGO, SOUTH SHORE AND SOUTH BEND RAILROAD, Debtor.**

No. 89 B 5898.

United States Bankruptcy Court, N.D. Illinois, E.D.

Sept. 25, 1992.

Chicago, South Shore and South Bend Railroad ("Trustee"), for partial summary judgment against Prescott, Ball & Turben, Inc. ("PB & T") on Counts I and II of his three count amended objection to claim number 723 of PB & T. For the reasons set forth below, the Court, after considering the pleadings, memoranda and exhibits, grants summary judgment with regard to Count II and denies summary judgment with regard to Count I.

## FACTS AND BACKGROUND

The relevant facts are undisputed. The Chicago, South Shore and South Bend Railroad ("Debtor" or "CSS") is a wholly owned subsidiary of the Venango River Corporation ("Venango"). (Trustee's Amended Statement of Uncontested Facts ("Trustee's Statement"), ¶ 6). In 1984, the Venango Acquisition Corporation ("VAC") was formed for the purpose of acquiring the Debtor's outstanding stock by way of a leveraged buyout. (Trustee's Statement, ¶ 7). In September, 1984, Venango and VAC purchased the Debtor's stock from its shareholders using $25,000,000 it had borrowed and $6,000,000 of its own cash. (Trustee's Statement, ¶ 8). Beginning in October, 1985, Venango entered into negotiations with the Illinois Central Railroad Company ("ICR") to purchase certain rail lines and related assets ("Rail Assets"). (Trustee's Statement, ¶ 9). The Chicago, Missouri & Western Railway Company ("CM & W") was organized in February, 1986 to purchase the Rail Assets from ICR. (Trustee's Statement, ¶ 10). Pursuant to a letter agreement dated February 20, 1986, PB & T agreed to provide services to assist in the acquisition of the Rail Assets. (Trustee's Statement, ¶ 11). On July 28, 1986, CM & W agreed to purchase the Rail Assets for $81,000,000. (Trustee's Statement, ¶ 12).

Following the execution of the purchase and sale agreement PB & T agreed to arrange financing for the purchase of the Rail Assets and did so from Citicorp Industrial Credit, Inc. ("Citicorp") and Heller Financial, Inc. ("Heller") (collectively, the

Mark P. Naughton, Jr. of Rudnick & Wolfe, Chicago, Ill., for Leroy G. Inskeep, Trustee for Chicago, South Shore and South Bend R.R.

Mark K. Thomas of Katten, Muchin & Zavis, Chicago, Ill., for Prescott Ball and Turben, Inc.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Chief Judge.

The matter before the Court is the motion of Leroy G. Inskeep, Trustee for the

"Lenders"). (Trustee's Statement, ¶ 14). As part of the financing of the Rail Assets purchase, PB & T arranged for refinancing of Venango's prior purchase of the Debtor's stock. (Trustee's Statement, ¶ 15). Thus, the Lenders loaned $81,000,000 for the purchase of the Rail Assets and $25,000,000 to the Debtor to refinance Venango's previous leveraged buyout of the Debtor's shareholders. (Trustee's Statement, ¶ 16).

One requirement of the Lenders' financing was that the Debtor guarantee all obligations of Venango and CM & W to the Lenders. (Trustee's Statement, ¶ 17). To secure all obligations to the Lenders, including the guarantees, the Debtor granted the Lenders a senior, blanket security interest in all of the Debtor's real and personal property. (Trustee's Statement, ¶ 18). CM & W and Venango also granted the Lenders similar liens. (Trustee's Statement, ¶ 19).

On or about April 28, 1987, Venango, the Debtor and CM & W entered into an agreement with PB & T to pay it a financing fee in the amount of $5,305,000 ("Financing Fee Agreement"). (Trustee's Statement, ¶ 20). Pursuant to the Financing Fee Agreement, PB & T received $2,867,500 at the closing of the purchase of the Rail Assets. (Trustee's Statement, ¶ 21). Contemporaneously, Venango, the Debtor, and CM & W entered into a subordinated promissory note ("Note") in favor of PB & T in the principal amount of $2,675,000 that by its terms is subject to a letter agreement of even date ("April 28, 1987 Letter Agreement"). (Trustee's Statement, ¶ 22–23). The April 28, 1987 Letter Agreement contains a provision subordinating the debt owed to PB & T to the debt owed to the Lenders ("Subordination Agreement"). (Trustee's Statement, ¶ 24).

The Debtor commenced a voluntary bankruptcy case pursuant to Chapter 11 of the Bankruptcy Code on April 7, 1989. (Trustee's Statement, ¶ 2).[1] On September 26, 1989, PB & T filed a claim for $3,384,964.12 stating that "[t]he consideration for [the claim] is ... principal and interest due but unpaid by the debtor pursuant to its promissory note dated April 28, 1987." (Trustee's Statement, ¶ 5, 25; Ex. 1). Citicorp and Heller filed a claim in this case in the amount of $28,980,426.67 on September 29, 1989. (Trustee's Statement, ¶ 26; Ex. 2). This Court approved an Asset Purchase Agreement dated October 5, 1989 allowing the Trustee to sell substantially all the Debtor's assets for approximately $26,000,000. (Trustee's Statement, ¶ 27).

Pursuant to the Debtor's First Amended Plan of Reorganization ("Plan") confirmed by this Court, the Lenders received $21,000,000 at the closing of the sale of the Debtor's assets as well as the right to receive up to $1,000,000 in "Other Consideration" as defined in the Plan. (Trustee's Statement, ¶ 29; Ex. 8). The Plan also provides for separate classes of allowed priority claims, § 1171(b) claims, and Interline Claims all of which have been paid in full totalling approximately $5,300,000. (Trustee's Statement, ¶ 30–34). The remaining funds are to be distributed to the Class 4 unsecured creditors which, excluding PB & T, exceed $1,000,000. (Trustee's Statement, ¶ 35–36). After all unsecured creditors have been paid, the Lenders have a right to receive up to $7,000,000 in "Other Consideration" as defined in the Plan. (Trustee's Statement, ¶ 37).

All of the Debtor's assets have been liquidated with the exception of a single cause of action for $21,000 against Clyde Forbes. (Trustee's Statement, ¶ 38). The Trustee is currently holding $1,126,849.02 from which estimated administrative expenses of $325,000 must be paid. (Trustee's Statement, ¶ 39). Regardless of the payment of costs of administration, the Trustee will not be able to pay the unsecured creditors in full. (Trustee's Statement, ¶ 40).

On February 25, 1991, the Lenders and the Trustee executed a document assigning to the Trustee all of the Lenders' rights under the Subordination Agreement ("Assignment Agreement"). (Trustee's Statement, Ex. 9). The Trustee filed a three count objection to PB & T's claim contend-

1. CM & W commenced voluntary bankruptcy proceedings on April 1, 1988.

ing that its claim should be subordinated to the claims of the other unsecured creditors based on the arguments that 1) pursuant to the Bankruptcy Code the Trustee has the power to seek enforcement of the provisions of the Subordination Agreement; 2) pursuant to the Assignment Agreement, the Trustee has the authority to enforce the Lenders' rights under the Subordination Agreement; and 3) PB & T's claim should be equitably subordinated to those of the Lenders. The motion presently before the Court is the Trustee's motion for partial summary judgment on Counts I and II of his objection to PB & T's claim.

## DISCUSSION

### I. Summary Judgment Standard

■ Federal Rule of Civil Procedure 56(d), known as the partial summary judgment rule, is applicable to this contested matter by Rule 7056 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and permits summary judgment of a portion of a proceeding if it completely disposes of one or more of the counts. *Biggins v. Oltmer Iron Works*, 154 F.2d 214, 216 (7th Cir.1946); *Capitol Records, Inc. v. Progress Record Distrib., Inc.*, 106 F.R.D. 25, 28 (N.D.Ill.1985). In order to prevail on a motion for summary judgment, the movant must meet the requirements set forth in Rule 56 of the Federal Rules of Civil Procedure which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Any inferences to be made from the underlying facts of the case must be made in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *O'Hare v.*

*Global Natural Resources, Inc.*, 898 F.2d 1015 (5th Cir.1990). Summary judgment is appropriate only if there remains no genuine issue of material fact for trial and the movant is entitled to judgment as a matter of law. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1339 (7th Cir. 1985).

### II. Enforceability of the Subordination Agreement

■ As an initial matter, it must be pointed out that the Trustee's objection to PB & T's claim seeks to subordinate that claim to the claim of the Lenders, it does not seek disallowance. An action for subordination presupposes allowance of the claim sought to be subordinated. R. Ginsberg, *Bankruptcy: Text, Statutes, Rules* § 10.13[a] at 839 (2d ed. 1990). Because the Trustee has not objected to the allowance of PB & T's claim, it is deemed allowed as a Class 4 unsecured claim. 11 U.S.C. § 502. What is at issue is whether PB & T's allowed claim is subordinated to the claims of the Lenders and if so, how the Subordination Agreement is affected by the Plan.

> Pursuant to § 510(a):
>
> A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

Thus, the enforceability of a subordination agreement hinges on its enforceability under state law. Illinois law is applicable to this case by virtue of paragraph six of the Financing Fee Agreement which was executed in conjunction with the Note and is subject to the provisions of the April 28, 1987 Letter Agreement. (Trustee's Statement, Ex. 3). In Illinois subordination agreements are enforceable. Ill.Rev.Stat. ch. 26 ¶ 1–209 (1991);[2] *Hinsdale Federal Savings & Loan Ass'n v. Gary–Wheaton Bank*, 100 Ill.App.3d 746, 749, 56 Ill.Dec. 558, 561, 427 N.E.2d 963, 966 (1981).

---

**2.** Ill.Rev.Stat. ch. 26, ¶ 1–209 states:
 ... a creditor may subordinate his right to payment of an obligation by agreement with either the person obligated or another creditor of the person obligated....

■ A subordination agreement is "... nothing more than a contractual modification of lien priorities and must be construed according to the expressed intention of the parties and its terms." *ITT Diversified Credit Corp. v. First City Capital Corp.*, 737 S.W.2d 803, 804 (Tex.1987). The parties to a subordination agreement normally consist of a "common debtor" who owes a debt to two creditors or two groups of creditors, a creditor known as the "junior creditor" that agrees to subordinate its debt to the debt of another creditor, and a "senior creditor" that benefits from the subordination agreement and acquires priority over the junior creditor. *In re Holly's, Inc.*, 140 B.R. 643, 668 (Bankr. W.D.Mich.1992). Such agreements are routinely entered into by one creditor to induce another to extend additional credit to the debtor or ensure that its loans are used as working capital by the debtor and not just to repay insider debts. *In re Holly's, Inc.*, 140 B.R. at 668 n. 37; *In re Lantana Motel*, 124 B.R. 252, 255–56 (Bankr. S.D.Ohio 1990).

■ The provision of the April 28, 1987 Letter Agreement ("Subordination Agreement") at issue in this case states:

To induce [the Lenders] to enter into the Credit Agreements and to extend the loans and other financial accommodations contemplated thereby, PB & T hereby agrees that, except as otherwise provided herein, *Prescott will not ask, demand, sue for, take or receive from [Venango, CSS, and CM & W], by setoff or in any other manner, the whole or any part of any monies which may now or hereafter be owing by any one or more of [Venango, CSS, and CM & W]*, or any successor or assign of any one or more of [Venango, CSS and CM & W], including, without limitation, a receiver, trustee or debtor-in-possession, to the undersigned pursuant to the Fee Agreement and the [Subordinated Promissory] Note (such monies are hereinafter collectively referred to as the "Prescott Obli-

gations"), *until all obligations, liabilities and indebtedness of ... [Venango, CSS and CM & W] to [Citicorp], Heller, the Agent and their successors and assigns* are hereinafter, from time to time, collectively referred to as the "Lenders" and all such obligations, liabilities and indebtedness of ... [Venango, CSS and CM & W] to the Lenders are hereinafter collectively referred to as the "Liabilities") *shall have been fully paid and satisfied with interest and all financing arrangements between ... [Venango, CSS and CM & W] and each of the Lenders have been terminated.*

(Trustee's Statement, Ex. 6). This provision constitutes a subordination agreement enforceable under Illinois law. This agreement is typical of subordination agreements generally enforced by courts under both the Bankruptcy Act and Code in that it consists of 1) a "common debtor," CSS, who owes debts to both the Lenders and PB & T, that agreed to subordinate its claim to those of the Lenders.[3] The terms are clear and the intent of the parties unequivocal. PB & T is not to receive payments from the Debtor until the Lenders are paid in full.

PB & T's sole attack on the Subordination Agreement is to argue that the April 28, 1987 Letter Agreement when taken as a whole does not create a subordination relationship between the Lenders and PB & T. In support of its contention, PB & T cites the following provision of the April 28, 1987 Letter Agreement:

Notwithstanding the provisions of the preceding paragraph: ...

(iii) Without the prior written consent of the Agent Prescott shall not, for a period of 120 days after any such Permitted Payment becomes due and payable, enforce payment of any Permitted Payment or prepayment or otherwise take any action against the Borrowers or any property of the Borrowers, provided, however, that nothing in this clause (iii) shall limit Prescott's right to accelerate the

---

3. *In re Holly's Inc.*, 140 B.R. at 670–72. (discussing cases under both the Bankruptcy Act and Code demonstrating that courts routinely en-

forced subordination agreement entered into between creditors).

outstanding principal balance of the Note pursuant to paragraph 3 of the Fee Agreement. (Trustee's Statement, Ex. 6). According to PB & T, this language eliminates any contractual right to subordination because it allows PB & T to 1) take action on a "Permitted Payment" 120 days after it becomes due and 2) accelerates the indebtedness immediately upon an event of default though it restrains PB & T from acting on an acceleration until 120 days after default. PB & T argues that giving effect to the Subordination Agreement makes no sense in light of the cited provision because to do so would allow PB & T to accelerate the debt, wait 120 days, and then require it to wait further until the Lenders are paid in full.

PB & T misinterprets the April 28, 1987 Letter Agreement. The actions permitted by clause (iii) only relate to "Permitted Payments" which are defined as payments made by the Debtor to PB & T that are allowed in writing by the Lenders by way of a written waiver of an "Event of Default" as defined in various credit agreements entered into between CSS, CM & W, Heller and Citicorp. Because clause (iii) only relates to PB & T's rights with regard to "Permitted Payments" and not the relationship between the Lenders and PB & T absent a "Permitted Payment," the legal effect of the Subordination Agreement remains intact.

III. Count I—Trustee's Standing to Enforce the Subordination Agreement[4]

■ In Count I of the Trustee's objection to PB & T's claim the Trustee argues that he can enforce the Subordination Agreement because such agreements are enforceable in bankruptcy cases pursuant to § 510(a). In opposition, PB & T asserts the Trustee lacks standing to enforce the Subordination Agreement. As both parties concede, there is little case law dealing with a trustee's standing to enforce a sub-

ordination agreement entered into between creditors. The Trustee contends he should be able to enforce the Subordination Agreement entered into by PB & T because to do so will inure to the benefit of all the creditors as occurs when he exercises his power to object to claims. PB & T argues that because the Trustee is not a party to the Subordination Agreement, any action to enforce the agreement can only be commenced by the Lenders.

■ While a bankruptcy court must enforce a subordination agreement enforceable under state law, it cannot be enforced by a trustee who has no interest in the agreement.[5] Neither § 510 nor any other provision of the Bankruptcy Code grants such power to trustees. In *In re Kors, Inc.,* 819 F.2d 19 (2nd Cir.1987), the Second Circuit held that a trustee who had properly avoided the unperfected security interest of a bank that was a senior creditor pursuant to a subordination agreement, was not subrogated to the bank's senior creditor status by virtue of his avoiding powers. In so holding the Second Circuit stated:

... the trustee would not accede to the benefits of the subordination agreement because [the debtor] was not a part of that agreement. Moreover, the trustee was vested only with the rights the Bank had against [the debtor]. (citation omitted). The Bank's rights against [the debtor] existed pursuant to the Security Agreement for the ... equipment. The Bank's subordination rights existed against [the other creditors] not [the debtor]. Hence, since the Bank had no rights as against [the debtor] with respect to the subordination agreement, the trustee was not vested with any of the Bank's rights in that agreement.

*In re Kors, Inc.,* 819 F.2d at 24. Likewise in this case, the Trustee was not a party to the Subordination Agreement. It was a contract entered into solely between the Lenders and PB & T. Therefore, the Trustee has no standing pursuant to the

---

4. Count I is not based on the Trustee's rights as assignee of the Lenders' rights under the Subordination Agreement.

■

5. See section IV below that discusses Count II in which the Trustee asserts an interest in the Subordination Agreement bestowed upon him by the Assignment Agreement.

Bankruptcy Code to enforce the Subordination Agreement and summary judgment is denied with regard to Count I.

## IV. Count II—Trustee's Right to Enforce the Subordination Agreement as the Lenders' Assignee

■ Count II is different. Here, the Trustee has the right to enforce the Subordination Agreement as the Lenders' assignee. There being no genuine issue of material fact, summary judgment must be granted in favor of the Trustee with regard to this count.

■ On February 25, 1991, the Trustee and Citicorp entered into the Assignment Agreement whereby Citicorp in its individual capacity and as the agent of Heller, assigned to the Trustee its rights under the Subordination Agreement including its right to insist on full payment before PB & T received any payments. (Trustee's Statement, Ex. 9). Under Illinois law, an assignment of rights under a contract is valid if the assignor has fulfilled all of its duties under the contract and the assignment demonstrates an intent to transfer indentifiable property of the assignor to the assignee for valuable consideration. *In re Estate of Martinek*, 140 Ill.App.3d 621, 629, 94 Ill.Dec. 939, 944, 488 N.E.2d 1332, 1337 (1986); *Rovak v. Parkside Veterans' Homes Project*, Inc., 8 Ill. App.2d 310, 132 N.E.2d 11 (1956). An assignee can be assigned no greater rights than those held by the assignor when the assignment was executed. *In re Woodstock Assoc. I, Inc.*, 120 B.R. 436, 443 (Bankr.N.D.Ill.1990). There is no doubt from the terms of the Assignment that the Lenders intended and did transfer their rights under the Subordination Agreement to the Trustee. In addition, nothing in the April 28, 1987 Letter Agreement prohibited such an assignment.

■ The Assignment Agreement is not contested. Instead, PB & T contends the Lenders had nothing to assign because the Plan fully satisfied their secured claims. This is incorrect. The Lenders' agreement to the terms of the Plan does not change the fact that they have not yet been paid in full on their underlying claim. Confirmation of a plan of reorganization does not extinguish contractual rights negotiated between creditors. As of confirmation, the Lenders had not been paid in full and, therefore, retained the right to insist that they be paid before PB & T and nothing prevented the assignment of that right.

■ Because the Subordination Agreement is enforceable under Illinois law and was properly assigned to the Trustee, this Court must enforce it so as to effectuate its terms and the parties' intentions within the context of the Plan without in any way modifying the parties' rights under the Subordination Agreement. 11 U.S.C. § 510(a). The intent of the parties in entering into the Subordination Agreement was to subordinate the debt owed to PB & T to that owed to the Lenders in order to induce the Lenders to extend credit to the Debtor. (Trustee's Statement, Ex. 6). The Trustee argues that enforcement of the Subordination Agreement within the context of the Plan means that PB & T should not be paid until after the Lenders' Class 1 payments are made, Classes 2, 3, and 4 are paid and the Lenders receive up to $7,000,000 in "Other Consideration" as defined by the Plan. Under this scenario, given the approximately $26,000,000 brought into the estate by the Trustee, the Class 4 unsecured creditors excluding PB & T would not be paid in full, the Lenders would receive no "Other Consideration," and PB & T would receive nothing. This scenario is not appropriate however as it would effectively subordinate PB & T's claim not only to that of the Lender but also to all the other Class 4 unsecured claims with whom PB & T should be on equal footing.

To effectuate the intent of the parties under the Subordination Agreement, the "Other Consideration" to be received by the Lenders cannot be permitted to subordinate PB & T's claim to those of the other unsecured Class 4 claimants as well as the Lenders' claims. To do otherwise would allow the provisions of the Plan to modify the Subordination Agreement negotiated between the Lenders and PB & T. Had this been a straight liquidation, the Lend-

ers would have received the secured portion of their claim first. If any portion remained as an unsecured claim, the Lenders would get their pro rata share along with the other unsecured creditors. However, under the Subordination Agreement, PB & T could not recover any portion of their unsecured claim until the Lenders were paid in full. PB & T's claim should be treated no differently within the context of the Plan confirmed. Therefore, the point at which PB & T could have begun receiving payments under the Plan is the point at which the total payments to any party, regardless of class, reach a total in excess of $29,000,000. This calculation ensures that PB & T could receive no payment until the Lenders are paid in full as per the Subordination Agreement but also ensures that PB & T will not be adversely affected by the terms of the Plan under which the Lenders agreed to forgo a portion of their secured claim so that the other creditors of the estate could receive a distribution that they would not otherwise receive.

Even if PB & T actually received a distribution as an unsecured creditor along with the Lenders and other unsecured creditors on a pro rata basis, the Lenders would have a claim for relief against PB & T under the Subordination Agreement for any payments made to PB & T before the Lenders were paid in full. The Lenders' right to payment in full before PB & T is no less enforceable by the Trustee in the present situation. In each scenario what is being enforced is the Lenders' right under the Security Agreement to payment in full before PB & T receives any payment—no more, no less.

The provisions of the Plan provide for a potential total of approximately $29,000,000 to be paid to the Lenders: $21,000,000 as a Class 1 claim paid upon the sale of substantially all the Debtor's assets, up to $1,000,000 as the first installment of the "Other Consideration" paid upon the sale of the Debtor's assets, and up to $7,000,000 paid out of any funds remaining after the Class 4 unsecured creditors are paid in full. So far, a total of approximately $27,300,000 in payments have been made: $21,000,000 to

the Lenders as their Class 1 claim, $1,000,000 in "Other Consideration" to the Lenders, approximately $1,300,000 to Class 2, and approximately $4,000,000 to Class 3. The difference between the total of payments made so far and the $29,000,000 figure that must be exceeded before PB & T could receive a distribution is approximately $1,700,000. Because approximately $1,126,849.02 remains in the estate, the total payments which could have been awarded to the Lenders as a secured creditor can never reach $29,000,000 and therefore PB & T has no right to any distribution that may be made to Class 4 unsecured claimants.

That Class 4 unsecured claimants other than PB & T will receive a distribution in this case is not unfair to PB & T and does not modify the relationship between the Lenders and PB & T set forth in the Subordination Agreement. PB & T is getting no less than they bargained for in entering into the Subordination Agreement with the Lenders. PB & T clearly intended to subordinate the debt owed to it by the Debtor to the debt owed to the Lenders in order to induce the Lenders to extend credit to the Debtor. Pursuant to § 510(a) the Subordination Agreement is enforceable in this bankruptcy case because it is enforceable under Illinois law. Thus, whether the Debtor is under the protection of the bankruptcy court or not, PB & T is not entitled to collect any part of its debt from the Debtor until the Lenders receive payment in full. Had enough money been brought into the Debtor's estate so that in excess of $29,000,000 had been distributed, PB & T would have been in a position to receive a distribution.

 Finally, the Court must address PB & T's remaining contentions that 1) subordination of the debt it is owed is contrary to the terms of the Plan; 2) the Lenders breached the Subordination Agreement by agreeing to receive "Other Consideration" after the Class 4 unsecured claimants' and 3) the Lenders; $acceptance of the Plan constitutes a waiver of their rights under the Subordination Agreement. First, PB & T argues that it is a Class 4

unsecured creditor as defined by the Plan and because the Plan does not expressly state that PB & T's claim is subordinated to those of any of the other unsecured creditors, it should receive payments on an equal basis with the other Class 4 unsecured creditors. Though the Plan does not expressly subordinate PB & T's claim nor classify it separately, the Plan does contemplate commencement of suits by the Trustee to subordinate claims of creditors. Under section 1.06 of the Plan, "Avoidance Actions" are defined as:

> any suits to recover, set aside, or otherwise have declared invalid or *subordinate*, a transfer of or *a Claim against the Debtor's assets*. This specifically includes, but is not limited to, proceedings brought under Code sections 502, 506, 508 through *510*, 542 through 545, and 547 through 553, as well as applicable state or federal statutes, regulations or legal theories.

(emphasis added). (Trustee's Statement, Ex. 8). In addition, section 5.08 of the Plan states that the Trustee anticipates that he or other parties in interest may contest Class 4 claims. PB & T was served with the Plan and did not object to its confirmation and therefore cannot escape these provisions which clearly contemplate the subordination of certain Class 4 claims.

■ Second, PB & T argues that the Lenders breached the Subordination Agreement by breaching the covenant of good faith and fair dealing implied in every contract under Illinois law. According to PB & T, the Lenders breached the covenant of good faith and fair dealing implied in the Subordination Agreement by accepting the "Other Consideration" to be paid after Class 4 claims have been fully satisfied thus subordinating them to other unsecured creditors. However, absent the Trustee's negotiations leading to the confirmation of a consensual Plan, the Lenders would have received all of the approximately $26,000,000 brought into the estate because it held a claim of approximately $29,000,000 and a security interest in all of the Debtor's property. It is inconsistent for PB & T to argue that by compromising their claim to allow some distribution to other creditors the Lenders acted in bad faith or unfairly towards PB & T. In addition, the Court has determined that it cannot enforce the Subordination Agreement within the context of the Plan in a way that would subordinate PB & T's claim to the unsecured creditors' claims. However, despite the Court's approach to the enforcement of the Subordination Agreement, there are insufficient funds to allow any distribution to PB & T. This result is no less and no more than PB & T bargained for when it entered into the Subordination Agreement and therefore cannot constitute a breach of good faith or fair dealing.

■ Finally, PB & T argues that by accepting the Plan, the Lenders have waived their right to enforce the Subordination Agreement. Waiver of a legal right is implied where the conduct of a party against whom the waiver is asserted is inconsistent with an intent to enforce that right. *Wells v. Minor*, 219 Ill.App.3d 32, 161 Ill.Dec. 691, 700, 578 N.E.2d 1337, 1346 (1991). The Lenders' acceptance of the Plan did not constitute a waiver of their rights under the Subordination Agreement because the Plan specifically states that the Trustee anticipated bringing subordination actions with regard to Class 4 claims. Therefore, accepting the Plan's provisions is in fact consistent with the enforcement of the Lenders' subordination rights. The Lenders' rights under the Subordination Agreement were properly assigned to the Trustee, and there has been no waiver on his part of his right to enforce that agreement.

## CONCLUSION

In conclusion, it must be stressed that the Court's enforcement of the Subordination Agreement within the context of the Plan does not disturb the substance of the relationship between the Lenders and PB & T under the Subordination Agreement. PB & T agreed not to seek payment of its debt until the Lenders are paid in full. The method by which this Court has calculated that PB & T is not entitled to any distribution recognizes and enforces the provisions

of the Subordination Agreement without also subordinating PB & T's claim to those of the other unsecured creditors. Despite this, the result under the facts of this case is the same as if the Court had followed the course suggested by the Trustee.

The Court, having found that there is no genuine issue of material fact and that the assignment of the Lenders' rights under the Subordination Agreement to the Trustee was valid, grants summary judgment with regard to Count II of the Trustee's objection to PB & T's claim.

### FINAL JUDGMENT ORDER

For the reasons set forth in the Memorandum Opinion of even date:

IT IS HEREBY ORDERED THAT the motion of Leroy G. Inskeep, Trustee for the Chicago, South Shore and South Bend Railroad, for partial summary judgment with regard to Count I of his objection to claim 723 of Prescott, Ball & Turben is denied.

IT IS FURTHER ORDERED THAT final judgment is entered in favor of Leroy G. Inskeep, Trustee for the Chicago, South Shore and South Bend Railroad and against Prescott, Ball & Turben, sustaining Count II of the Trustee's objection to claim 723 of Prescott, Ball & Turben. Claim number 723 of Prescott, Ball & Turben's is allowed, but for the reasons set forth in Section IV of the Memorandum Opinion of even date PB & T shall receive no distribution. There is no just reason to delay enforcement of or appeal from this final judgment as the disposition of Count II of the Trustee's objection disposes of this matter in its entirety.