# In re PERRYSBURG MARKETPLACE CO., Debtor.

## Mary L. MILLER, Plaintiff,

v.

## MIF REALTY L.P., et al., Defendants.

Bankruptcy No. 94–32588.
Adv. No. 94–3195.

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

April 9, 1997.

Stephen Schweller, Mark Bissinger, Rita Miller Altimari, Reuel Ash, Cincinnati, OH, for MIF Realty L.P.

Ralph Bragg, Michael Bragg, Toledo, OH, for plaintiff.

Marshall Guerin, Toledo, OH, for Barkan & Robon.

H. Buswell Roberts, Jr., John Gustafson, Toledo, OH, for PMC.

**OPINION AND ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT OF MARY L. MILLER, PERRYSBURG MARKETPLACE CO., PERRYSBURG LAND DEVELOPMENT INC., BARKAN & ROBON AND MARVIN A. ROBON, GRANTING MIF REALTY L.P.'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING DECLARATORY JUDGMENT IN FAVOR OF MIF REALTY L.P.**

WALTER J. KRASNIEWSKI,
Bankruptcy Judge.

This matter is before the Court on defendant MIF Realty L.P.'s ("MIF") motion for summary judgment against Mary L. Miller ("Miller") on Miller's adversary complaint to determine the validity, priority and extent of MIF's mortgages, assignment of rents and assignment of leases against a leasehold on certain real property which the debtor-in-possession, Perrysburg Marketplace Company "PMC"), has leased from Miller. PMC and Miller have filed cross motions for summary judgment seeking to void MIF's interest in the leasehold mortgages. Likewise, Barkan & Robon ("B & R") and Marvin A. Robon ("Robon"), PMC's former attorneys, and Perrysburg Land Development, Inc. ("Land"), a corporation owned by PMC's principal Joseph Swolsky ("Swolsky"), have filed cross motions seeking to void MIF's interest in the leasehold mortgages. Alternatively, Miller's adversary complaint seeks a ruling that her fee interest in the real estate

is senior in priority to MIF''s mortgages on the leasehold, notwithstanding Miller's execution of subordination agreements in favor of MIF''s predecessor in interest in 1983 and 1984.

MIF also seeks summary judgment on its counterclaims and cross claims against PMC, B & R, Robon and Land for a declaratory judgment that MIF''s mortgages have first priority against the real estate, that a promissory note executed in conjunction with the leasehold mortgages is valid, and that the assignments of leases and rents are valid and enforceable. MIF further seeks an order permitting it to sell the real estate in satisfaction of the mortgages.

The Court finds that the motions for summary judgment of PMC, Miller, Land, B & R and Robon are not well taken and should be denied. The Court further finds that MIF''s motion for summary judgment is well taken and should be granted, except to the extent that MIF seeks an order permitting it to sell the real estate in satisfaction of the mortgages without obtaining relief from stay and abandonment with regard to the real estate.

### POSITIONS OF THE PARTIES

PMC, Miller, Land, B & R and Robon offer several arguments in support of their position that MIF''s mortgages on PMC's leasehold estate are void. First, they argue that the mortgages are void because MIF''s predecessor in interest, the RTC, lost the original promissory note executed by PMC. Second, they argue that PMC's obligation to MIF under the lost note and mortgages was extinguished by a bond trustee's repayment of certain bonds issued by Wood County, Ohio in a transaction related to PMC's execution of the note and mortgages. Third, they argue that MIF''s action on the note and mortgages is precluded by a prior action by the RTC against PMC for servicing, administrative and standby loan commitment fees, which the RTC prosecuted in its capacity as receiver and conservator for the former Freedom Federal Savings and Loan Association. Fourth, they argue that the Court should deny enforcement of the lost note and mortgages because of MIF''s alleged champerty.

Miller argues that the mortgages should not be enforced because they were not properly witnessed, because the mortgage executed in 1983 improperly sought to convey a mortgage in fee simple rather than a mortgage in PMC's leasehold, and because the mortgage executed in 1984 was without consideration. Further, Miller argues that the subordination agreements which she executed in 1983 and 1984 should not be enforced because they were ambiguous, and because MIF''s predecessor in interest allegedly breached its obligations under the subordination agreements.

Not surprisingly, MIF argues that the lost note should be enforced and that its mortgages represent the first and best liens on PMC's leasehold interest. MIF further argues that the subordination agreements are unambiguous and should be enforced according to their terms.

### FACTS

On August 8, 1980, Miller executed a forty-five year ground lease of undeveloped farmland in favor of S & W Land Company. S & W Land Company subsequently assigned the lease to PMC.

### The Note, the Leasehold Mortgages and the Related Assignments of Rents, Assignments of Leases and Subordinations

In order to finance the construction of the Perrysburg Marketplace Shopping Center in Perrysburg Township, Ohio (the "Marketplace"), PMC executed a ten-year note in the amount of $2,200,000.00 in favor of Freedom 1 (the "Note"). *See* Swolsky Deposition, at p. 35. In its answer to MIF''s cross claim, PMC admits "that it executed a commitment letter dated April 13, 1983 and a promissory note". Docket No. 12, Answer of Perrysburg Marketplace Co. To Cross Claim of MIF Realty, L.P., at p. 1, para. 2. To secure the Note, PMC granted Freedom 1 a leasehold mortgage on four parcels of real estate on April 13, 1983 (the "1983 Mortgage"). Docket No. 12, Answer of Perrysburg Marketplace Co. To Cross claim of MIF Realty, L.P., at p. 2, para. 3. Freedom 1 recorded the 1983 Mortgage on April 14, 1983. PMC

also executed an assignment of rents and an assignment of leases to secure the Note.

Swolsky acknowledges that Freedom 1 paid PMC $2,200,000.00.

According to the affidavit of Michael D. Saad, the primary attorney representing Freedom 1 at the time of the loan transaction between Freedom 1 and PMC, "it was a requirement of [Freedom 1] to have the fee interest subordinated to [Freedom 1's] mortgage in order to make the loan to [PMC]". Motion of MIF for Summary Judgment, Exhibit 4, Affidavit of Michael D. Saad (hereinafter "Saad Aff."), at pp. 3–4, para. 9. On April 12, 1983, Miller subordinated her interest in the real estate to the 1983 Mortgage (the "1983 Subordination"). The 1983 Subordination sets forth the fact that Freedom 1 was loaning PMC a principal amount of $2,200,000.00. The 1983 Subordination further states that:

> [Miller] does hereby intentionally waive, relinquish and subordinate the priority and superpriority of her ownership interest in Premises in favor of the [1983 Mortgage] (an executed copy of which is attached hereto). [Miller] understands that [Freedom 1] is acting in reliance upon and in consideration of this waiver, relinquishment and subordination; specific loans are being and will be made, and as part and parcel thereof, specific monetary and other obligations are being made and will be entered into by third parties which would not be made or entered into but for such reliance upon this waiver, relinquishment and subordination. [Miller] further acknowledges that the fee simple ownership of the Premises has, by this instrument, been subordinated to the [1983 Mortgage].

1983 Subordination, at pp. 1–2, para. 1. Freedom 1 recorded the 1983 Subordination on April 14, 1983.

In June, 1984, PMC sought to draw the balance of the $2,200,000.00 construction loan, in excess of $1,340,000.00, despite the fact that PMC had failed to meet certain requirements for disbursement of the funds required by the construction loan documents. As a condition precedent to Freedom 1's disbursement of the balance of the $2,200,-0000.00 construction loan, in excess of $1,340,000.00, Freedom 1 required PMC to execute an additional leasehold mortgage (the "1984 Mortgage"). MIF's Motion for Summary Judgment, Exhibit 1.A. § 5.01, p. 4; Docket No. 12, Answer of Perrysburg Marketplace Co. To Cross claim of MIF Realty, L.P., at p. 2, para. 4. The 1984 Mortgage covers the parcels of land where the Kroger and K–Mart stores are presently located (the "K Parcels"). Freedom 1 recorded the 1984 Mortgage on May 17, 1984.

In connection with the 1984 Mortgage, Miller executed a "Leasehold Mortgage Consent and Estoppel Certificate and Subordination Agreement" (the 1984 Subordination"). The language of the 1984 Subordination parallels that of the 1983 Subordination in all material respects. Leasehold Mortgage Consent And Estoppel Certificate And Subordination Agreement, at p. 1, para. 4. According to Saad, "[i]t was the requirement of [Freedom 1] to have the fee interest subordinated to [Freedom 1's] mortgage in order for [Freedom 1] to advance in 1984 the unadvanced portion of the construction loan." Saad Aff., at p. 4, para. 10. Freedom 1 recorded the 1984 Subordination on June 22, 1984. Stipulation of Facts, at p. 3, para. 11.

Miller benefited from subordinating her fee interest to the 1983 Mortgage by receiving increased ground rent. PMC's rent obligation rose from $12,000.00 annually to $7,972.50 per month after construction of the Marketplace. Stipulation of Facts, at p. 3, para. 10.

In June of 1984, Freedom 1 sold the Note to Nassau Savings and Loan Association ("Nassau 1").

In conjunction with the sale of the Note, Freedom 1 assigned the 1983 Mortgage and the 1984 Mortgage (collectively, the "Mortgages") to Nassau 1, along with the related assignments of rents (the "Rent Assignments") and assignments of leases (the "Lease Assignments"), and the subordination agreements (the "Subordinations"). *See* MIF's Motion for Summary Judgment, Exhibit 1.G. (Assignment of 1983 Mortgage); Exhibit 1.H. (Assignment of Assignment of Leases and Rents); Exhibit 1.I. (Assignment of 1984 Mortgage and Assignment of Leases

and Rents); MIF has provided the Affidavit of Thomas J. Moskal ("Moskal"), who served as Senior Vice President/Chief Lending Officer of Nassau 1 from November, 1984 through March, 1991. MIF's Motion for Summary Judgment, Exhibit 6, First Affidavit of Thomas J. Moskal ("First TJM Aff."). Moskal's affidavit incorporates copies of the Assignment and Assumption Agreement between Freedom 1 and Nassau 1 and the Whole Loan Sale And Servicing Agreement between Freedom 1 and Nassau 1. First TJM Aff., at pp. 2–3, para. 6–7.

On February 15, 1990, the Office of Thrift Supervision ("OTS") appointed the Resolution Trust Corporation ("RTC") as receiver for Freedom 1. MIF's Motion for Summary Judgment, Exhibit 1.T. The RTC was subsequently appointed conservator for Freedom Savings and Loan Association, F.A. ("Freedom 2"), a newly formed entity which took over Freedom 1's assets. MIF's Motion for Summary Judgment, Exhibit 1.U.

On March 8, 1990, the OTS appointed the RTC as receiver for Nassau 1. MIF's Motion for Summary Judgment, Exhibit 1.V. RTC was appointed conservator of a newly formed entity, Nassau Federal Savings and Loan Association ("Nassau 2"), which took over Nassau 1's assets. MIF's Motion for Summary Judgment, Exhibit 1.W.; Exhibit 6, Affidavit of Thomas J. Moskal, at p. 2, para. 2.

On June 30, 1993, the RTC, acting in its capacity as conservator for Nassau 2, sold its interest in PMC's obligation to MIF. On the same date, the RTC assigned the Mortgages, the Rent Assignments, the Lease Assignments and the Subordinations to MIF. *See* MIF's Motion for Summary Judgment, Exhibit 1.L.

On July 1, 1993, several months prior to MIF's filing of a state court foreclosure suit against PMC, Miller and PMC executed a document entitled "Release and Cancellation of Subordination Agreement" which purported to cancel the 1983 Subordination.

In a separate adversary proceeding within this bankruptcy case, PMC has alleged that its July 15, 1993 assignment of the leases for the K Parcels to Land represents a fraudu-lent conveyance. *See* MIF's Response to Motions for Summary Judgment of B & R and Land, Exhibit 13.B, Complaint, at Count III, para. 41–44.

On November 10, 1993, PMC filed a chapter 11 petition in the United States Bankruptcy Court for the Middle District of Pennsylvania which case was subsequently transferred to this Court.

**Wood County, Ohio's Issuance of Bonds and the Certificate of Deposit Owned by the Bond Trustee for the Benefit of the Bondholders**

In connection with PMC's execution of the Note and the 1983 Mortgage in favor of Freedom 1, Wood County, Ohio ("Wood County") issued $2,200,000.00 in Lender–Assisted Economic Development Revenue Bonds (the "bonds") in order to provide PMC with a favorable interest rate. An underwriter sold the bonds as a tax-exempt investment.

The bond trustee, BancOhio National Bank nka National City Bank, Columbus ("NCB"), deposited the bond proceeds at Freedom 1 which issued a certificate of deposit ("CD") in favor of the bondholders. The CD served as security for the bonds. In May, 1984, Nassau 1 assumed Freedom 1's liability to the bondholders and issued a CD to replace the CD previously issued by Freedom 1. MIF Motion for Summary Judgment, Exhibit 3, Affidavit of Ellen E. Wiseman, at p. 3, para. 9 (hereinafter "EEW Aff."), and at p. 4, para. 10, EEW Aff., Exhibit C, Certificate of Deposit; *see* MIF's Motion for Summary Judgment, Exhibit 6, First Affidavit of Thomas J. Moskal, at pp. 2–3, para. 5–7 (hereinafter "TJM Aff.), and attached Exhibits A and B. After the RTC became the conservator for the assets and liabilities of Nassau 2, Sovereign Bank ("Sovereign") acquired certain of Nassau 2's assets and liabilities and assumed Nassau 2's liability on the CD. EEW Aff. at p. 4, para. 13.

In the instant adversary proceeding, PMC, Robon, B & R, Miller and Land argue that the bond trustee's April 1, 1993 payment of bonds from the proceeds of a CD held for the benefit of the bondholders extinguished PMC's obligation on the Note and Mortgages notwithstanding PMC's admission that it did

not purchase the CD and that it did not pay the bondholders or the Note. *See* Deposition of Joseph Swolsky, at p. 31, at p. 33, and at pp. 44–45.

Glendon Pratt, an attorney who has served as bond counsel "on several hundred bond transactions involving the issuance of Municipal Bonds", performed a review of the documents underlying the issuance of the bonds for purposes of the instant adversary proceeding. Motion of MIF for Summary Judgment, Exhibit 2, Affidavit of Glendon B. Pratt. Based on his review of the bond transaction, Pratt states that:

> [t]he payment of the bonds when they matured on April 1, 1993 from the proceeds of the CD and the various bond funds referenced in Article IV of the Indenture of Trust in no way relieved [PMC] from its obligations under the April 13, 1983 promissory note and related security agreements. Rather, the payment of the bonds at maturity was to be made primarily from the funds received as a result of the $2.2 million CD becoming due. [PMC] remained obligated to satisfy its obligations under the April 13, 1983 promissory note and related security agreements.

Motion of MIF for Summary Judgment, Exhibit 2, Affidavit of Glendon B. Pratt, at p. 5, para. 10.

Ellen Wiseman, an employee of NCB's Trust Department since 1982, and the person primarily responsible for NCB's trusteeship, states that she explained to PMC's principal Joseph Swolsky ("Swolsky") in the late 1980's that the proceeds from the CD would be used to pay the bondholders rather than the Note. EEW Aff., at pp. 6–7, para. 18.

Richard Spoor ("Spoor"), who served as bond counsel in connection with PMC's financing of the Marketplace, stated in his deposition that the repayment of the CD did not extinguish PMC's obligation on the Note. MIF's Motion for Summary Judgment, Exhibit 1.0, at pp. 46–47; *see also* B & R's Reply Brief, Exhibit A, Spoor's Affidavit, at p. 3, para. 7 (stating that Spoor believed that the Note was enforceable "assuming there [were] not other defenses or irregularities").

In his deposition, Swolsky stated that he did not know if he had examined any of the documents associated with the bond financing. Swolsky Deposition, at p. 24. He testified that "I really don't understand exactly the flow of dollars and the transaction, period. I wasn't involved in the negotiation of the financing at all". Swolsky Deposition, at p. 25, line 24—p. 26, line 3. In addition, he stated that he "[didn't] feel competent to evaluate the bond documents". Swolsky Deposition, at p. 48. Swolsky further stated that he "had no understanding about the CD account". Swolsky Deposition, at p. 37–38. Indeed, he stated that, prior to NCB's payment of the bondholders, he had no idea what source of funds would be used to pay the bondholders. Swolsky Deposition, at pp. 61–62.

**Freedom 2's Retained Right to Servicing, Administrative and Standby Loan Commitment Fees on the Note, and the RTC's Suit on Behalf of Freedom 2 Which Resulted in a Judgment Against PMC for Servicing, Administrative and Standby Loan Commitment Fees**

Although Freedom 1 sold the Note and assigned the Mortgages to Nassau 1 in June of 1984, Freedom 1 retained the right to collect servicing and administrative fees. Freedom 1 also retained the right to collect standby loan commitment fees which PMC had previously agreed to pay pursuant to an April 13, 1983 standby commitment letter. *See* MIF's Motion for Summary Judgment, Exhibit 1. A., Affidavit of Michael Saad, at § 5.01.

In March, 1991, because of "certain problems with the servicing of the loan by [Freedom 2]", Freedom 2 transferred the servicing rights for the Note to Nassau 2. However, Freedom 2 retained the right to collect approximately $54,254.17 in past due servicing, administrative and standby loan commitment fees owed by PMC. TJM Aff., at p. 3.

On August 22, 1991, the RTC, in its capacity as conservator for Freedom 2, sued PMC in the Court of Common Pleas of Franklin County, Ohio seeking to collect the servicing, administrative and standby commitment fees which PMC owed to Freedom 2. *See* Stipulation of Facts, Exhibit 10, at p. 3, Complaint

filed by RTC as Conservator and Receiver for Nassau 2. PMC removed this suit to the United States District Court for the Southern District of Ohio, Eastern Division. In November, 1992, the United States District Court ("District Court") granted judgment in favor of the RTC, acting on behalf of Freedom 2 (the "Judgment"). *See* Stipulation of Facts, Exhibit 12, Judgment Entry, at pp. 2–3, para. 10 (granting RTC, as receiver for Freedom 2, judgment against PMC and other related parties).

Prior to removal of the RTC's action to federal court, B & R represented to the Court of Common Pleas of Franklin County that the RTC's actions in seeking to collect unpaid servicing, administration, and standby commitment fees owed to Freedom 2 were in derogation of Nassau 2's rights. *See* MIF Exhibit F at p. 4, Deposition of Marvin A. Robon, at p. 18, and MIF Exhibit F at p. 9, Creditor's Exhibit 15 at p. 3.

**MIF's Evidence In Support of Its Claim Under the Lost Note**

The RTC, while acting as conservator for Nassau 2, admittedly lost the Note. PMC acknowledges that it never repaid the Note, Swolsky Deposition at pp. 44–47, which had an approximate principal balance of $1,900,-000.00 as of February, 1992. Swolsky Deposition at p. 44–45. PMC, Miller, Land, B & R and Robon contend that RTC's loss of the note invalidates MIF's claim under the Note and Mortgages.

In asserting its claim under the lost note, MIF has presented Saad's affidavit which incorporates what he has identified as a true and accurate copy of the Note. Saad Aff., Exhibit A. Further, Moskal's affidavit incorporates what he has identified as a true and accurate copy of the Note.

The Court's comparison of the copy of the note appended to Saad's affidavit, the copy of the note appended to Moskal's affidavit and the copy of the note appended to Miller's adversary complaint as Exhibit J indicates that the three copies of the note are the same except that the copies attached to Miller's complaint and to Moskal's affidavit indicate that the note was endorsed to Nasau Savings and Loan Association without recourse.

In a supplemental affidavit (hereinafter "Second TJM Aff."), Moskal states that "the original promissory note was in the possession of [Nassau 1] at the time the RTC was appointed as Conservator of [Nassau 1]. MIF's Response in Opposition to B & R and Land's Motions for Summary Judgment, Exhibit 15, Second TJM Affidavit, at p. 2, para. 15. Moskal further states that "[t]o the best of [his] knowledge and belief, the original promissory note remained in the RTC's possession, as conservator for [Nassau 2], at least through April or May of 1991 when [he] left [Nassau 2]." Second TJM Affidavit, at pp. 2–3, para. 5.

The affidavit of Deborah A. Bacon ("Bacon Aff."), the asset manager in charge of MIF's PMC account, provides a copy of a "Lost Note Affidavit" which MIF received from Nassau 2 when it purchased PMC's obligation from Nassau 2. MIF's Motion for Summary Judgment, Exhibit 7. The Lost Note Affidavit states that, although the RTC made a diligent search, the RTC was unable to determine the whereabouts of the Note. The Lost Note Affidavit further represents that the Note has not been "discharged, satisfied, sold, assigned, transferred, hypothecated or encumbered". Bacon Aff., Exhibit A, Lost Note Affidavit, p. 2, para. 6.

The parties agree that PMC's default in repaying the Note occurred no later than February, 1992. *See* Affidavit of Joseph H. Swolsky, at p. 3, para. 9.

According to Bacon's uncontroverted affidavit, the balance due on the Note totaled $2,373,308.51 on October 21, 1993.

**B & R's Argument that MIF's Attempt to Collect on the Note is Champertous**

B & R, Miller and PMC have argued that MIF's attempt to collect on the Note and Mortgages constitutes champerty. In opposition, MIF has provided the affidavit of Randolph Hirsch ("Hirsch"), a former employee of General Electric Capital Corporation ("GECC"). MIF's Motion for Summary Judgment, Exhibit 8, Affidavit of Randolph Hirsch (hereinafter "Hirsch Aff."). Hirsch's affidavit describes MIF's organizational structure and MIF's interest in the instant litigation.

GECC is one of the principals of MIF Gen–Par L.P., an entity which owns 75% of MIF. As its name indicates, MIF Gen–Par L.P. serves as MIF's general partner. Hirsch Aff., at p. 2.

MIF's principals formed MIF in order to purchase a pool of loans with a face value of $1 billion dollars from the RTC. Hirsch Aff. at p. 2–3. MIF purchased loans which "were almost exclusively promissory notes, mortgages and related security documents on commercial properties." Hirsch Aff. at p. 5, para. 12.

MIF paid the RTC 37.5% of the cash value for assets purchased and executed promissory notes in favor of the RTC for 50% of the purchase price.

Specifically addressing B & R's allegations of champerty, Hirsch states that MIF:

did not, and does not, have a contract with the RTC to institute or continue litigation or other collection proceedings in consideration for MIF Realty L.P. receiving part of the proceeds thereof if the outcome of litigation or other collection activities is favorable. MIF Realty L.P. did not buy lawsuits from the RTC.

The equity holders of MIF Gen–Par L.P. have a direct and very significant financial stake in the outcome of the resolution of the assets sold to MIF Realty by the RTC. The equity holders of MIF Gen–Par L.P. invested approximately $170,000,000 into the partnership to purchase the assets. A substantial number of assets have been resolved through either discounted payoffs by borrowers, foreclosure or other negotiated settlements. However, MIF Realty, L.P., alone, not its partners individually, has the right to collect on the assets, such as notes and mortgages, purchased from the RTC. In other words, MIF Realty L.P. has an actual and significant interest in such collection efforts, including any litigation, relating to those assets. MIF Realty L.P. is not a stranger to the above-captioned lawsuit and it is paying only its own expenses in asserting its interest in the note and mortgage at issue therein.

Hirsch Aff., at pp. 5–6, para. 12–13.

In support of their allegations of champerty, Land and B & R have provided a copy of a page from the sale documents executed by the RTC and MIF entitled "Appendix H— RTC Valuation and Methodology for Portfolio Sales Commercial Mortgages and Real Estate Owned". B & R and Land's Reply Brief in Support of Motion for Summary Judgment, Second Affidavit of Marvin A. Robon, Exhibit B, Attachment A. Contrary to the allegations of Land and B & R, however, this document does not set forth an agreement between the RTC and MIF for the RTC's payment of MIF's legal fees. Rather, the document describes one aspect of the methodology used by the RTC to value the properties purchased by MIF.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgement is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Valot v. Southeast Local School District Board of Education,* 107 F.3d 1220, 1224–25 (6th Cir.1997) (citing Fed.R.Civ.P. 56(c)) (other citations omitted). "There is no genuine issue of material fact when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party'". *Dollar Corp. v. Zebedee (In re Dollar Corp.),* 25 F.3d 1320, 1322 (6th Cir.1994) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)); *see also Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1483–84 (6th Cir.1989) (stating that summary judgment is warranted where a nonmoving has "relied on a forlorn hope that 'something would turn up at trial'" or "rel[ied] on the now invalidated duty of the trial court to search the record for some 'metaphysical doubt' as to a material fact that might be lurking there") (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56).

### APPLICATION OF STANDARD FOR SUMMARY JUDGMENT

#### JURISDICTION

This Court has jurisdiction to determine the nature, priority and extent of MIF's interest in the leasehold mortgages conveyed

by PMC to MIF's predecessor in interest pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (C).

## B & R'S ARGUMENT THAT THE PRIOR JUDGMENT BARS MIF FROM ASSERTING A CLAIM IN THE INSTANT BANKRUPTCY CASE

■ The Court rejects B & R's argument that the Judgment precludes MIF from asserting a claim in the instant bankruptcy case based on the Note and Mortgages.

B & R argues that while the federal law of res judicata generally applies in determining the preclusive effect of a prior federal proceeding, see *J.Z.G. Resources, Inc. v. Shelby Ins. Co.,* 84 F.3d 211, 213–14 (6th Cir.1996), the Court must apply Ohio law in analyzing whether MIF is in privity with the RTC, acting as conservator for Freedom 2. *See Petromanagement Corp. v. Acme–Thomas Joint Venture,* 835 F.2d 1329, 1333 (10th Cir.1988) (citations omitted). Regardless whether the Court applies federal law or Ohio law, the Court agrees with MIF that claim preclusion does not bar its action under the lost note and Mortgages because the RTC "clearly acted in separate and distinct capacities" in representing the interests of Freedom 2 and Nassau 2. MIF's Response to Defendants' Motion for Summary Judgment, at p. 14. *See Jaramillo v. Burkhart,* 999 F.2d 1241, 1243–46 (8th Cir.1993) (held that mother, suing in her capacity as guardian of granddaughters, was not barred by prior action which she prosecuted as administrator of daughter's estate under Nebraska law); *cf. Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa, S.A.,* 56 F.3d 359, 368 (2nd Cir.1995) (held that litigation of vessel charterer's personal liability for damage to plaintiff's property was not precluded by prior litigation against charterer in its representative capacity) (citations omitted); *Hussey v. Aetna Life Ins. Co.,* 104 Ohio App.3d 6, 660 N.E.2d 1228, 1230–31 (1995) (held that action brought as executor of decedent's estate did not bar subsequent action brought by executor in individual capacity). Further, PMC, Miller, Land, B & R, and Robon have not presented evidence that the RTC was acting on behalf of Nassau, or that the interests of Nassau were adequately rep-

resented, in the prior litigation. *American Postal Workers Union Local AFL–CIO v. United States Postal Serv.,* 736 F.2d 317, 318 (6th Cir.1984). Indeed, prior to removal of RTC's action to federal court, B & R represented to the Court of Common Pleas of Franklin County that the RTC's actions in seeking to collect unpaid servicing, administration, and standby loan commitment fees owed to Freedom 2 were in derogation of Nassau 2's rights. *See* MIF Exhibit F at p. 4, Deposition of Marvin A. Robon, at p. 18, and MIF Exhibit F at p. 9, Creditor's Exhibit 15 at p. 3.

## WHETHER MIF CAN RECOVER ON THE LOST NOTE

■ The Court must apply state law in determining whether MIF can assert its claim under the lost note. *Federal Deposit Ins. Corp. v. Houde,* 90 F.3d 600, 604 (1st Cir.1996) (citation omitted); *DiVall Insured Income Fund Ltd. Partnership v. Boatmen's First Nat'l Bank of Kansas City,* 69 F.3d 1398 (8th Cir.1995); *Resolution Trust Corp. v. Love,* 36 F.3d 972, 974 (10th Cir.1994); *Resolution Trust Corp. v. Maplewood Investments,* 31 F.3d 1276, 1293–94 (4th Cir.1994).

■ The Court finds that former Ohio Rev.Code § 1303.77 applies in determining whether MIF can recover on the lost Note. In other words, presently enacted § 1303.38 which became effective on August 19, 1994, should not be applied retroactively. Applying § 1303.38 to transactions and events arising prior to its enactment could impair MIF's right to enforce the lost note. *See Public Citizen, Inc. v. First Nat'l Bank In Fairmont,* 198 W.Va. 329, 480 S.E.2d 538, 544 (1996) (held that amendments to UCC Article 3 concerning ambiguous payees which attached new legal consequences to completed events would not be applied retroactively); *Carelli v. Hall,* —— Mont. ——, 926 P.2d 756, 761–62 (1996) (held that amendment to Montana's UCC concerning liability of a party on an instrument signed by a representative did not have retroactive effect); *cf. Bill Call Ford, Inc. v. Ford Motor Co.,* 48 F.3d 201, 208 (6th Cir.1995) (concluding that application of Ohio statute to transactions between parties to contract prior to enactment of statute would constitute an impermissible

retroactive application of statute); *Kiser v. Coleman,* 28 Ohio St.3d 259, 503 N.E.2d 753, 755–56 (1986) (held that statute limiting forfeitures on land sale contracts could not be applied retroactively to contract entered into before effective date of statute).

■ MIF must establish its entitlement to recover under the lost note by the preponderance of the evidence. *Household Finance Corp. v. Johnson,* 56 Ohio App.2d 14, 381 N.E.2d 215, 216 (1978).

■ Here, as in *Culkar v. Fanter,* the Court finds that MIF has presented sufficient evidence to establish its claim under the lost note. *Culkar v. Fanter,* 1989 WL 132104 at *2, unpublished (Ohio App. Nov. 2, 1989). The copies of the Note appended to the affidavits of Saad and Moskal evidence the terms of the Note. *See Culkar v. Fanter,* 1989 WL 132104 at *2, unpublished (Ohio App. Nov. 2, 1989) (granting contractor's claim for judgment on lost note and mortgage based on uncontroverted evidence which included copy of promissory note and signed letter of intent), *motion cert. overruled,* 50 Ohio St.3d 708, 553 N.E.2d 689 (1990); *see also Gutierrez v. Bermudez,* 540 So.2d 888, 890 (Fla.App.1989) (held that mortgagee, who identified copies of original note and mortgage, proved terms of note); *Central Nat'l Bank of New York v. Bernstein,* 15 Conn.App. 90, 544 A.2d 239, 240 (1988) (held that photostatic copies of originals proved the terms of instruments) (citations omitted); *First Fed. Sav. And Loan Assoc. of Chicago v. Chicago Title And Trust Co.,* 155 Ill.App.3d 664, 108 Ill.Dec. 126, 127, 508 N.E.2d 287, 288 (1987) (granting judgment on note where mortgagor did not dispute that copies were complete and accurate); *Guaranty Bank And Trust Co. v. Dowling,* 4 Conn.App. 376, 494 A.2d 1216, 1219 (1985) (concluding that copy of lost promissory note provided sufficient evidence of existence of original where defendant offered no evidence that copy was not accurate and did not dispute terms of promissory note); *Pecora v. Szabo,* 94 Ill.App.3d 57, 49 Ill.Dec. 577, 581, 418 N.E.2d 431, 435 (1981) (finding that plaintiff had made prima facie case where defendant admitted execution and nonpayment of note). The fact that the copy of the Note provided by MIF is consistent with the terms set forth in the 1983 Mortgage filed in Wood County supports MIF's claim that the copy is genuine. *Culkar,* 1989 WL 132104 at *2; *Barber v. Ehrich,* 394 So.2d 220, 221 (Fla.App.1981). Further, Swolsky admits that the DIP ultimately received the $2,200,000.00 principal amount recited in the note from Freedom 1.

Moskal's affidavits establish that the RTC, MIF's predecessor in interest, once possessed the original note. *See Staats v. Hamrick,* unpublished, 1992 WL 147387 at *1, Case No. 91–CA–22 (Ohio App. May 4, 1992) (stating that "[a] necessary prerequisite to proving the loss of an instrument is, obviously, that the original instrument once actually existed").

Further, Bacon's affidavit has established that the Note was lost by the RTC. *See Diebold v. Drach,* 1984 WL 6158, at *1 (Ohio App. May 9, 1984) (granting foreclosure on lost note and mortgage in case where mortgagee testified that he "simply lost the note"); *see also Gutierrez v. Bermudez,* 540 So.2d 888, 890 (Fla.App.1989) (held that mortgagee established that note was lost by testimony that she placed note and mortgage in desk drawer in her home and that documents mysteriously disappeared in case decided under provision analogous to former O.R.C. § 1303.77); *Central Nat'l Bank of New York v. Bernstein,* 15 Conn.App. 90, 544 A.2d 239, 242 (1988) (concluding that testimony of bank's vice president established that notes had previously existed and could not be found).

Contrary to the allegations of PMC, Miller, Land B & R and Robon, the testimony of MIF's former employee Morgan Scott ("Scott") in the state court foreclosure proceeding has not created a genuine issue of material fact on the issue of whether MIF can recover under the lost note. Scott erroneously testified that MIF possessed the original note. Even if the Court could accept the argument that Scott lied to the state court in the foreclosure proceeding, the fact remains that MIF has not relied on Scott's testimony in order to establish its claim under the lost note. The parties do not dispute the fact that one of MIF's predecessors in

interest lost the note. Therefore, Scott's credibility is not an issue in this adversary proceeding.

## WHETHER MIF CAN RECOVER UNDER THE MORTGAGES

Even if MIF was precluded from recovering on the lost note under Ohio Rev.Code § 1303.77, the Court finds that MIF has presented sufficient evidence to recover under the Mortgages under Ohio law. *New England Savings Bank v. Bedford Realty*, 238 Conn. 745, 680 A.2d 301, 309 (1996).

In Ohio, the right to judgment on a note and the right to foreclose on a related mortgage represent two separate causes of action. *Metropolitan Life Ins. Co. v. Triskett Illinois, Inc.*, 97 Ohio App.3d 228, 646 N.E.2d 528, 532 (1994) (citation omitted); *Gushman v. Farber*, unreported, 1985 WL 10349 at *1 (Ohio App.1985) (citation omitted); *see Carr v. Home Owners Loan Corp.*, 148 Ohio St. 533, 76 N.E.2d 389, 393 (1947) (stating that "[a]lthough they may be properly joined, an action to foreclose a mortgage and an action for personal judgment on the note secured by the mortgage, are separate and distinct").

It is axiomatic that "[t]he mortgage secures the indebtedness itself, not the written evidence of it." *New England Savings Bank v. Bedford Realty Corp.*, 238 Conn. 745, 680 A.2d 301, 309 (1996) (citation and internal quotation marks omitted); *Kuhns v. McGeah*, 38 Ohio St. 468, 472 (1882) (citations omitted); *cf. Tropicana Shippings, S.A. v. Empresa Nacional 'Elcano' de la Marina Mercante*, 366 F.2d 729, 733 (5th Cir.1966) (stating that "it is well established that the validity of a mortgage is dependent only on the existence of a debt actually secured by the mortgage and not on the description of the debt contained in the instrument") (citing *In re Farmers' Supply Co.*, 170 F. 502 (S.D.Ohio 1909)) (other citations omitted). The Supreme Court of Ohio has stated that:

> [t]he purpose of a mortgage is to secure the payment of a debt. No change in the form of evidence, or the mode or time of payment, not amounting to actual payment of the debt, or an express release, will operate to discharge the mortgage.

*Riegel v. Belt*, 119 Ohio St. 369, 164 N.E. 347, syllabus (1928); *see also Brown v. First Nat'l Bank of Hamilton*, 44 Ohio St. 269, 6 N.E. 648, 650 (1886) (stating that "[i]t is a familiar principle that, whatever changes the evidence of a mortgage debt may undergo, or into whosesoever hands it may pass, the mortgage security still attaches to it and remains an incident of it until it is discharged") (citations omitted); *cf. TransOhio Savings Bank F.S.B. v. Patterson*, 69 Ohio App.3d 471, 590 N.E.2d 1338, 1340 (1990) (concluding that landlord's mortgage lien did not lose priority because of modification or termination of lease which mortgage secured where original debt which mortgage secured was not canceled or paid in full) (citing *Riegel*), *cert. overruled*, 57 Ohio St.3d 725, 568 N.E.2d 1229 (1991). Therefore, MIF's failure to produce the original note does not prevent MIF from presenting other evidence in proof of the debt. *New England Savings Bank v. Bedford Realty*, 238 Conn. 745, 680 A.2d 301, 309 (1996).

MIF has established its right to recover under the Mortgages. Swolsky freely admits that PMC received $2,200,000.00 from Freedom 1 and that PMC ceased making payments on the mortgage debt in February, 1992 when PMC owed approximately $1,900,-000.00 on the Mortgages. MIF's predecessor in interest recorded the Mortgages over ten years ago and no genuine issue of material fact has arisen as to the authenticity of the Mortgages. Further, MIF has presented evidence of the chain of assignments of the Mortgages from Freedom 1 to MIF.

Furthermore, the Court rejects the arguments raised by PMC, Miller, Land, B & R and Robon as to the validity of the Mortgages.

First, Miller argues that the 1983 Mortgage is invalid because it purportedly sought to convey a mortgage in fee simple while PMC only possessed a leasehold estate. However, the plain language on the first page of the 1983 Mortgage indicates that PMC possessed a leasehold estate at the time that it executed the 1983 Mortgage. Moreover, the Court agrees with MIF that, in circumstances where a leasehold mortga-

gor purports to grant a mortgage in a fee simple interest, such conveyance must be construed as a leasehold mortgage. *See* Ohio Rev.Code § 5301.02; Ohio Rev.Code § 5302.04.

■ Second, the Court rejects Miller's argument that the 1984 Mortgage was invalid because it was improperly witnessed. The affidavit of Kim Werner establishes that the 1984 Mortgage was witnessed by two persons.

Third, the facts establish that Freedom 1 provided consideration for the 1984 Mortgage by advancing additional construction loan funds to PMC. PMC's preexisting debt to Freedom 1 also provided consideration for the 1984 Mortgage. *Pease Co. v. Huntington Nat. Bank,* 24 Ohio App.3d 227, 495 N.E.2d 45, 50 (1985).

## WHETHER THE PAYMENT TO THE BONDHOLDERS FROM THE PROCEEDS OF THE SOVEREIGN BANK CD EXTINGUISHED PMC'S OBLIGATION ON THE NOTE

■ The Court's review of the affidavits of Pratt and Wiseman, and the deposition testimony and affidavit of Spoor has convinced the Court that Sovereign Bank's payment to the bondholders did not extinguish PMC's obligation under the Note. In his deposition, Swolsky testified that he did not understand the bond transaction from its inception. The Court has disregarded Swolsky's subsequent affidavit, which contradicts his earlier deposition testimony, in the absence of any explanation as to why his testimony has changed since the time of the deposition. *Aparicio v. Norfolk & Western Ry. Co.,* 84 F.3d 803, 814 (6th Cir.1996); *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 315 (6th Cir.1989) (citations omitted); *see* Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure, (2nd ed. 1983), Volume 10A, pocket part at § 2726 (stating that "[i]t seems quite clearly correct to conclude that when an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but that does not give a satisfactory explanation of why the testimony is changed").

## MILLER'S ARGUMENT THAT THE SUBORDINATION AGREEMENTS ARE INEFFECTIVE

The Court agrees with MIF that the Subordinations are unambiguous and should be enforced according to their terms.

Section 510(a) of title 11 provides that:

[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

11 U.S.C. § 510(a).

■ "A subordination agreement is to be interpreted in accordance with ordinary contract principles.... When the contract is unambiguous, the parties rights are governed exclusively by the contract." *In re General Homes Corp., FGMC,* 134 B.R. 853, 864 (Bankr.S.D.Tex.1991) (citations omitted).

■ The Court finds that there was adequate consideration for the Subordinations. The funds which Freedom 1 loaned to PMC clearly benefited Miller's reversionary interest in the premises. *In re Cliff's Ridge Skiing Corp.,* 123 B.R. 753, 765 (Bankr. W.D.Mich.1991). The fact that Freedom 1 did not sign the Subordinations is beside the point. *See* Ohio Rev.Code § 1335.04 (requiring that grant or assignment of interest in land be "signed by the party assigning or granting it"); Ohio Rev.Code § 1335.05 (stating that no action shall be brought to charge a person upon an interest in land absent a signed writing by the party to be charged); *cf. In re Lantana Motel,* 124 B.R. 252, 255 (Bankr.S.D.Ohio 1990) (concluding that mortgagee need not sign subordination under Florida law); *Southern Floridabanc Federal Sav. and Loan Ass'n v. Buscemi,* 529 So.2d 303, 304 (Fla.App.1988) (per curiam) (subordination of prior mortgage effective despite the fact that subsequent mortgagee who benefited from subordination had not signed subordination).

■ Moreover, the Court finds that Miller was estopped from "releas[ing] and cancel[ing]" the Subordinations. *See Republic*

*National Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 353 (Minn.1979) (holding that subordination agreement was enforceable even though it "lack[ed] specificity" where it had "been in existence for 15 years, where the subordination clause ha[d] been used ·and relied upon by the parties for 14 years, [and] where large sums ha[d] been lent in good faith"); *First Connecticut Small Business Investment Co. v. Arba, Inc.*, 170 Conn. 168, 365 A.2d 100, 102–03 (Conn.1976) (held that defendant/mortgagee was estopped from asserting that subordination agreement violated statute of frauds where plaintiff had loaned funds to its detriment based on representations contained in subordination agreement); *Dreckshage v. Community Fed'l Savings and Loan Assoc.*, 555 S.W.2d 314, 322–24 (Mo.1977) (concluding that holders of deed of trust, who had subordinated their deeds of trust to a later deed of trust without reading the subordination agreements, were junior in priority to the later deed of trust where the later conveyance was made in reliance on subordination agreements, notwithstanding the fact that a third party had fraudulently induced the holders of the earlier deeds of trust to execute subordination agreements).

■■■ Contrary to Miller's argument, the Subordinations did not make her a surety for MIF. *Lebs Partnership Ltd. v. Northwestern Mutual Life Ins. Co.*, unpublished, 1992 WL 25001 at *4–5, Case No. 965 (Tenn.App. Feb. 14, 1992) (concluding that ground lessor's subordination of fee in favor of mortgage did not place ground lessor in the position of surety with respect to mortgagee) (citations omitted), *appeal denied*, (Tenn. May 18, 1992); *cf. Matthews v. Hinton*, 234 Cal.App.2d 736, 44 Cal.Rptr. 692 (1965) (held that lessor was not a surety of lessee's secured creditor).

## WHETHER MIF'S PROSECUTION OF THE INSTANT ACTION CONSTITUTES CHAMPERTY

■■■ Despite the allegations raised by B & R, Miller and PMC to the contrary, MIF's prosecution of its secured claim against PMC does not represent champerty. *See Reece v. Kyle*, 49 Ohio St. 475, 31 N.E. 747, 749 (1892) (distinguishing cases in which "it [d[id] not

appear that the party maintaining the contract had any interest in or claim upon the cause of action other than that given by the assignment" in holding that contract was not champertous); *cf. E.W. Bliss Co. v. Cold Metal Process Co.*, 1 F.R.D. 193, 196 (N.D.Ohio 1940) (stating that "a party who has a real interest in litigation may make a contribution to the conduct of such litigation") (citations omitted).

Finally, the Court concludes that MIF has perfected its interest in the rents and leases by its filing in the county recorder's office. *In re Miller*, 133 B.R. 882, 884 (Bankr. N.D.Ohio 1991); *cf. Great–West v. Parke Imperial Canton, Ltd.*, 177 B.R. 843, 857 (N.D.Ohio 1994).

In light of the foregoing, it is therefore

ORDERED that MIF Realty L.P.'s motion for summary judgment be, and it hereby is, granted except to the extent that MIF seeks foreclosure of its liens. It is further

ORDERED that the liens of MIF Realty, L.P. as set forth in the 1983 Mortgage and the 1984 Mortgage be, and they hereby are, declared to be the first and best liens on the real estate described in said mortgages. It is further

ORDERED that MIF Realty L.P. be, and it hereby is, entitled to collect, retain, use and enjoy the rents, income and profits from the real estate described in the 1983 Mortgage and the 1984 Mortgage. It is further

ORDERED that the motions for summary judgment of plaintiff Mary Miller, and defendants PMC, Barkan & Robon, Marvin A. Robon, Trustee, and Perrysburg Land Development, Inc. be, and they hereby are, denied.