**In re Robert Anthony KOBAK and Elizabeth Ann Kobak, Debtors.**

**Robert Anthony Kobak and Elizabeth Ann Kobak, Plaintiffs,**

v.

**National City Bank, et al., Defendants.**

Bankruptcy No. 01–63660.
Adversary No. 01–6192.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

June 28, 2002.

Edwin Breyfogle, Massillon, OH, for Plaintiffs-Debtors.

Jon J. Liebermann, Lerner, Sampson & Rothfuss, Cincinnati, OH, for Fifth Third Bank.

Alan C. Hochheiser, Stacie Wittenberg, Weltman, Weinberg & Reis, Cleveland, OH, for National City Bank.

## MEMORANDUM OF DECISION

RUSS KENDIG, Bankruptcy Judge.

Robert Anthony Kobak and Elizabeth Ann Kobak (hereafter "Debtors") filed a complaint, pursuant to Federal Rule of Bankruptcy Procedure 7001(2), to determine the extent, priority and amount of liens held against Debtors' real property. Defendants National City Bank (hereafter "NCB") and Fifth Third Bank (hereafter "Fifth Third") answered the complaint, each asserting it held the first and best lien.

Now before the court are cross-motions for summary judgment, and responses, filed by NCB and Fifth Third. Jurisdiction of this proceeding is premised in 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K). In accordance with Federal Rule of Bankruptcy Procedure 7052, the court's findings of facts and conclusions of law are set forth in this opinion.

## I. FACTS

The facts are undisputed. Debtors filed a bankruptcy petition on August 28, 2001. Listed as an asset was real property located at 1263 Tupela Lane, West Salem, Ohio. According to schedule A, the property has a value of $200,000.00. Schedule D identified the following secured claims on the property:

| Fifth Third Bank | $146,844.94 |
| National City Bank | $142,192.00 |
| National City Bank | $264,000.00 |

The parties agree the liens arose in the following manner. NCB filed an open-end mortgage on January 12, 1998. The original amount of the mortgage was $600,000. Following NCB's recording, Strongsville Savings Bank recorded a mortgage on Oc-

tober 27, 1998. Fifth Third now holds the October 27, 1998 mortgage as successor to Strongsville Savings Bank.

Thereafter, NCB recorded a mortgage on September 25, 2000. At that point in time, the liens were held in the following priority:

| Priority: | Mortgagee: | Approx. Balance at Petition Date: | Record Date: | Mortgage Face Amount: | Recorder's Cite: |
|-----------|-----------|-----------------------------------|--------------|-----------------------|------------------|
| First | NCB | $264,000.00 | 01/12/1998 | $600,000.00 | Vol. 82, Page 586 |
| Second | Fifth Third | $147,000.00 | 10/27/1998 | $157,300.00 | Vol. 114, Page 209 |
| Third | NCB | $142,000.00 | 09/25/2000 | $150,000.00 | Vol. 184, Page 179 |

On October 17, 2000, NCB filed a subordination agreement with the county recorder. The agreement states:

This agreement is entered into this 7th day of September, 2000 by and between National City Bank (Bank) Ashland, Ohio and Robert A. Kobak and Elizabeth Kobak, West Salem, Ohio (Debtor).

Recitals:

Whereas, Robert A. Kobak and Elizabeth A. Kobak have executed their mortgage deed to National City Bank to secure a loan dated December 29, 1997 in the amount of $600,000.00 which mortgage was filed for record January 12, 1998 and recorded in Volume 82, Page 586–588 of the Ashland County Mortgage Records; and

Whereas Robert A. Kobak and Elizabeth Kobak have executed an additional mortgage deed to National City Bank to secure a loan dated September 7, 2000 in the amount of $150,000.00, which mortgage was filed for record September 25, 2000 and recorded in Volume 184, Page 179–181 of the Ashland County Mortgage Records;

Now therefore, for good and valuable consideration by National City Bank to Robert A. Kobak and Elizabeth A. Kobak for the granting of the secured loan, the parties hereby agree that the mortgage recorded in Volume 82, Page 586–

588 is hereby subordinated as to priority to the mortgage recorded in Volume 184, Pages 179–181.

(typeface partially altered). The agreement subordinates the January 1998 mortgage to the September 2000 mortgage, but NCB and Fifth Third are unable to agree how the subordination agreement affects priority of the liens.

## II. ARGUMENTS

Defendant NCB argues that it holds the first and best lien on the property. According to NCB, the subordination agreement subordinates the January 12, 1998 mortgage to the September 25, 2000 mortgage. Therefore, the lien arising from the September 25, 2000 mortgage is the first and best lien on the property because it steps in front of the January 1998 lien which was first in line prior to the subordination agreement. The essence of NCB's argument is that the liens exchanged positions. Because Fifth Third was not a party to the subordination agreement, NCB argues that the subordination agreement does not affect, adversely or nonadversely, Fifth Third's interest.

Fifth Third argues that it holds the first and best lien on the property. It is Fifth Third's position that the filing of the subordination agreement on September 25, 2000 resulted in placing the NCB liens in second and third positions, behind Fifth Third. Fifth Third reasons: since the ear-

lier recorded lien was subordinated to the later recorded lien, the filing date of the later recorded lien controls. Since Fifth Third's interest was recorded earlier than the lien given priority through the subordination agreement, Fifth Third holds the first and best lien.

## III. STANDARD OF REVIEW

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, as adopted by Federal Rule of Bankruptcy Procedure 7056. The rule provides that a motion for summary judgment should be granted "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In reviewing a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in the [moving party's] materials must be viewed in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (quoting *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). If the evidence as presented "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party "bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thereafter, the nonmoving party must come forward and demonstrate the existence of genuine issues of material fact. The nonmoving party cannot merely rely on the pleadings or a mere scintilla of evidence to demonstrate the existence of such facts but instead must specifically set forth evidence sufficient to demonstrate the existence of disputed material facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Cities Serv.*, 391 U.S. at 288, 88 S.Ct. 1575. Only facts which could conceivably impact the outcome of the litigation are material. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505.

## IV. LAW AND ANALYSIS

■ The question before the court is rooted in an issue often referred to as "circular priority." *See Duraflex Sales & Serv. Corp. v. W.H.E. Mech. Contractors*, 110 F.3d 927 (2nd Cir.1997); *In re Cliff's Ridge Skiing Corp.*, 123 B.R. 753 (Bankr. W.D.Mich.1991). Because of the subordination agreement, lien priority is not a simple question of who was "first-in-time." Rather, the court must determine the effect of a subordination agreement on a lienholder not party to the agreement.

Prior to the agreement, NCB held first and third positions, while Fifth Third occupied the second. Following execution of the agreement, Fifth Third's position can either remain unchanged, or, as Fifth Third argues, improve.

Judge Sellers in the Bankruptcy Court for the Southern District of Ohio set forth a comprehensive review of subordination agreements:

A subordination agreement is an agreement by which a party having a superior right of some sort agrees with someone

having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior. Feinstein and Kayles, *Foreclosure: Subordination, Non–Disturbance and Attornment Agreements,* Prob. and Prop., July/August 1989, at 38. In the context of commercial financing, subordination agreements may be generally classified as being one of two types: debt subordinations or property interest subordinations. (footnote omitted).

In debt subordination, the agreement provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant. If the debt subordination is "complete," the subordinated creditor is barred from receiving payments until the superior debt is paid in full.

Debt subordinations are routinely utilized when a corporate or partnership borrower seeks financing from a commercial lender. The commercial lender will insist that all indebtedness of the corporation or partnership to management or other insiders be subordinated to the lender's proposed financing. The lender demands subordination for reasons more than just security; the lender wants its loans to be used as working capital in the borrower's business and not just to repay insider debts.

Debt subordination should be contrasted to property interest subordination. In a property interest subordination, the agreement affects only the relative rights of parties in particular real or personal property. Property interest subordination does not concern any rights the parties may have to receive payments.

The most common type of property interest subordination is lien subordination. By executing a lien subordination agreement, the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse until the other party's secured claim has been satisfied. *See,* U.C.C. § 9–316. In a pure lien subordination, the subordinating party's right to receive payments is not limited.

*In re The Lantana Motel,* 124 B.R. 252, 255–56 (Bankr.S.D.Ohio 1990). Upon review, the court concludes the agreement between NCB and Debtors was a lien subordination. NCB demoted the priority of the January 1998 lien to the lien recorded in September 2000.

■ The parties do not challenge the validity or enforceability of the agreement. The Bankruptcy Code provides, at 11 U.S.C. § 510(a), that "[a] subordination agreement is enforceable in a case under this title to the same extent that such an agreement is enforceable under non-bankruptcy law." The issue presented concerns the impact execution had on the existing lien interests. Thus, the court must look to controlling non-bankruptcy law to determine the subordination agreement's effect.

■ As set forth in the Ohio Revised Code, priority interests are subject to subordination. *See* O.R.C. § 1309.339. The right to subordinate interests is not unfettered, however. A subordination agreement cannot adversely affect the interest of an entity not party to the agreement. *See In re Smith,* 77 B.R. 624 (Bankr. N.D.Ohio 1987) (citing *Pioneer–Cafeteria Feeds, Ltd. v. Mack (In re Wyse),* 340 F.2d 719, 723 (6th Cir.1965)); *In re Henzler Mfg. Corp.,* 36 B.R. 303, 305 (Bankr. N.D.Ohio 1984) (citation omitted). The subordination agreement was executed between the Debtors and NCB; Fifth Third was not a signatory to the contract. Since Fifth Third was not a party, Fifth Third's interests cannot be harmed by execution of

the subordination agreement between Debtors and NCB. The question is whether Fifth Third's position can be improved as a result of the subordination agreement.

Under Ohio law, subordination agreements are "to be interpreted in accordance with ordinary contract principles . . . When a contract is unambiguous, the parties rights are governed exclusively by the contract." *Miller v. MIF Realty (In re Perrysburg Marketplace Co.)*, 208 B.R. 148, 160 (Bankr.N.D.Ohio 1997) (citing *In re General Homes Corp., FGMC*, 134 B.R. 853, 864 (Bankr.S.D.Tex.1991) (citations omitted)). The subordination agreement specifically states that the first mortgage is subordinated as to priority to the third mortgage. Subordinate is defined as "[p]laced in a lower order, class, or rank; occupying a lower position in a regular descending series; inferior in order, nature, dignity, power, importance, or the like; belonging to an inferior order in classification, and having a lower position on a recognized scale; secondary, minor." Black's Law Dictionary 994 (6th ed.1991). At no point does the subordination agreement evidence an intent to subordinate the NCB interest to Fifth Third's interest.

Clearly, if the first NCB mortgage is to be subordinated to the second NCB mortgage, it must assume a lower priority status than the first mortgage. However, there is more than one way that this may be conceptualized. The court poses three examples. First, the January 1998 lien could become junior to both the Fifth Third and September 2000 lien. This would improve Fifth Third's position as it would be entitled to payment in full before any other lienholder. Second, the lien could simply trade places with the January 1998 lien. This also would improve Fifth Third's position because the September 2000 lien is a smaller obligation. In the event of foreclosure, less money would be allocated to the claim of the first lienholder, putting the second lienholder in a better position. The third alternative would truly keep Fifth Third in the exact same position:

A, B and C have claims against the debtor which are entitled to priority in alphabetical order. "A" subordinates his claim to "C." After foreclosure of the secured interest, the resulting fund is insufficient to satisfy all three claims. The proper distribution of the fund is as follows.

1. Set aside from the fund the amount of "A"'s claim.

2. Out of the money set aside, pay "C" the amount of its claim, pay "A" to the extent of any balance remaining after "C"'s claim is satisfied.

3. Pay "B" the amount of the fund remaining after "A"'s claim has been set aside.

4. If any balance remains in the fund after "A"'s claim has been set aside and "B"'s claim has been satisfied, distribute the balance to "C" and "A".

*See* Gilmore, *Security Interests in Personal Property* § 391.1 at 1021 (1965).

Thus, "C", by virtue of the subordination agreement, is paid first, but only to the amount of "A"'s claim, to which "B" was in any event junior. "B" receives what it had expected to receive, the fund less "A"'s prior claim. If "A"'s claim is smaller than "C"'s, "C" will collect the balance of its claim, in its own right, only after "B" has been paid in full. "A", the subordinator, receives nothing until "B" and "C" have been paid, except to the extent that its claim, entitled to first priority, exceeds the amount of "C"'s claim, which, under its agreement, is to be paid first.

*Cliff's Ridge,* 123 B.R. at 767 (citing *ITT Diversified Credit Corp. v. First City Capital Corp.,* 737 S.W.2d 803, 804 (Tex.1987) (citations omitted)).

Upon review of the authorities, the court concludes that the third alternative, and the one advanced in *ITT Diversified,* is the stronger position. Fifth Third was not a party to the subordination agreement and therefore its position should not be impaired or enhanced by that agreement. *See Duraflex,* 110 F.3d at 935; *Cliff's Ridge,* 123 B.R. at 767. Through the subordination agreement, NCB affected a partial lien subordination similar to that presented in both *Duraflex* and *Cliff's Ridge.* Since the September 2000 lien secured a smaller obligation, the first priority lien was not completely subjugated. This approach maintains Fifth Third's original position without change. Since Fifth Third was not a party to the subordination agreement, this conclusion is rational and equitable.

Further, the result promotes positive economic benefits and fosters commercial transactions and economic efficiency. NCB's two separate loans may be sold or transferred independently, thus enhancing the efficiency of capital markets. Fifth Third's interpretation is one of "legal gotcha" which does not enhance the efficiency of anything and discourages lending to distressed parties. The nonparty to the subordination agreement is left in the same position it was prior to the execution and with the same potential expectation of recovery. When Fifth Third entered into the mortgage agreement with Debtors, it knew what was in front of it, an open-end mortgage for $600,000, and the maximum which could be covered by that mortgage. Since the mortgage was open-ended, and contained a future addance clause, Fifth Third also knew that the balance could be increased to as much as $600,000 at any time. *See* O.R.C. § 5301.232. It entered into the transaction knowing the ceiling of the first mortgage and the risk created thereby.

The subordination could not extend priority to amounts by which both loans exceed the limit of the highest ranking open-end mortgage. That is not an issue in this case. Fifth Third continues to receive the benefit of its bargain and maintains its priority position in spite of the subordination agreement. NCB's position changes only to the extent it agreed to through subordination.

The result does not restrict transferability, so there is no disincentive to avoid these types of transactions. The benefits to subordination agreements was noted in *Duraflex:* "such agreements accelerate the flow of cash to troubled projects—financial relief that promotes the development of assets that secure payments to all lienholders." *Duraflex,* 110 F.3d at 936.

This decision is in accord with statements made by the Sixth Circuit: "[i]t is to be noted, however, that the enforcement of subordination agreements between creditors of the same bankrupt, affects only their rights and does not interfere with or change the rights of other creditors." *Pioneer–Cafeteria Feeds, Ltd. v. Mack (In re Wyse),* 340 F.2d 719, 723 (6th Cir.1965); *see also In re Smith,* 77 B.R. 624 (Bankr.N.D.Ohio 1987); *Hunter v. Ohio Citizens Bank (In re Henzler Mfg. Corp.),* 36 B.R. 303, 305 (Bankr.N.D.Ohio 1984). Through adoption of the above approach, Fifth Third's position is neither improved nor impaired. NCB was free to loan up to $600,000.00 from a first lien position prior to Fifth Third granting its loan, which Fifth Third knew from the public record. This decision preserves and advances the reasonable expectations of the parties. The goal of the law is pre-

serving and advancing reasonable expectations.

## V. CONCLUSION

Debtors and NCB executed a subordination agreement whereby NCB agreed to subordinate its first priority lien to its third priority lien. Fifth Third's secured interest held second priority when the subordination agreement was recorded. The subordination agreement is valid and enforceable pursuant to 11 U.S.C. § 510(a) and state law. Fifth Third was not a party to the agreement nor did the agreement evince an intent to subordinate any of NCB's interest to Fifth Third. NCB's September 2000 lien merely took senior status and "displaced" the first priority lien in an amount equal to the obligation secured by the September 2000 lien. The recording of the subordination agreement did not result in a positive or negative change to Fifth Third's position, thereby leaving Fifth Third in the exact same position as it was prior to the recording of the agreement.